# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

IRFAN DEMIRTAS

No. 11-cr-356 (RDM)

## MEMORANDUM OPINION AND ORDER

This matter is currently before the Court on the defendant's motion to dismiss the indictment for violation of his Sixth Amendment right to a speedy trial.  Dkt. 24.  For the reasons explained below, the Court will deny that motion.

## I.  FACTUAL BACKGROUND

The defendant, Irfan Demirtas, is a Dutch and Turkish citizen.  Dkt. 58-1 at 2; Dkt. 67-1 at 3.  He is charged with providing, attempting to provide, and conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count I); providing, attempting to provide, and conspiring to provide material support or resources to a designated terrorist organization (the Islamic Movement of Uzbekistan ("IMU")) in violation of 18 U.S.C. § 2339B (Count II); receiving military-type training from a foreign terrorist organization in violation of 18 U.S.C. § 2339D (Count III); using, carrying, possessing, brandishing, or discharging a firearm during and in relation to a crime of violence, to wit, Counts I–III, in violation of 18 U.S.C. § 924(c)(1)(A) (Count IV); as well as aiding and abetting the foregoing crimes, in violation of 18 U.S.C. § 2.  Dkt. 3.

Prior to his indictment on these charges, Dutch police arrested Demirtas on May 16, 2008, in the Netherlands pursuant to a European Arrest Warrant issued by French authorities, who were pursing their own investigation of Demirtas's involvement with the IMU.  Dkt. 58-1 at

2; Dkt. 80-2 at 3.  On July 18 or 19, 2008, Demirtas was delivered to France pursuant to that

warrant. Dkt. 24; Dkt. 58-1 at 2; *see* Dkt. 78-13.  In accordance with Dutch law and pursuant to

an order of a Dutch court, the Dutch surrender of Demirtas to the French was conditioned on a

promise that, if Demirtas was convicted and sentenced by the French, "he may serve his sentence

in the Netherlands." Dkt. 78-13 at 4 (citing Article 6 of the Dutch Surrender of Persons Law).

The French then detained Demirtas pending an investigation by a French magistrate

specializing in counterterrorism investigations. [1] Transcript of Aug. 3–4, 2016 Hearing ("Aug.

3–4 Tr.") at 33 (Dkts. 81, 83, 84). The French investigation culminated in charges that Demirtas

"direct[ed] an[d] organiz[ed] a criminal conspiracy to plan acts of terrorism and finance[ed] a

terrorist undertaking." Dkt. 73-1 at 2; Transcript of June 1, 2016 Hearing ("June Tr.") at 48

(Dkt. 69).

In late 2008, the Federal Bureau of Investigation ("FBI") learned that Demirtas was in

French custody and commenced its own investigation.  Dkt. 24 at 2; Dkt. 44 at 4.  As part of that

investigation, the FBI and Assistant United States Attorney Michael C. DiLorenzo interviewed

Demirtas on September 24, 2009, while he was in French custody. Dkt. 58-7 at 2.  Over two

years later, on December 8, 2011, a U.S. grand jury returned an indictment under seal containing

the charges outlined above. *See* Dkt. 3.[2] All four counts stemmed from Demirtas's alleged ties

to the IMU. *Id.* A magistrate judge issued a bench warrant for Demirtas's arrest, also under seal,

the same day.

---

[1]  In the French system, a magistrate investigates a criminal case and then presents the evidence
to a prosecutor with a recommendation.  Aug. 3–4 Tr. at 37–38.

[2]  The original indictment provided that the relevant conduct for Counts I–IV occurred between
January 2006 and May 2008 in "Pakistan, Afghanistan, Turkey, Jordan, [t]he Netherlands,
France, and elsewhere outside the United States." Dkt. 3. The operative superseding indictment
narrows the time period for Count IV to July 2006 through June 2007. *See* Dkt. 43.

On January 18, 2012, the U.S. government issued an Interpol diffusion seeking Demirtas's identification and detention pending a formal request for extradition (also known as a provisional arrest). Dkt. 58-8 at 3; *see* June Tr. at 6. The following day, DiLorenzo contacted Monique Roth, a trial attorney with the Department of Justice's ("DOJ") Office of International Affairs ("OIA"), who served as the DOJ's attaché in Paris, seeking assistance with an extradition from France in what he referred to as the "IMU case." Dkt. 67-3 at 2 (Carter Decl. ¶ 6); *see* Aug. 3–4 Tr. at 29, 32; Dkt. 79-8 at 1. As the DOJ's attaché in Paris, Roth "was essentially the representative of the Central Authority for the United States for all mutual legal assistance and extradition matters with the French." Aug. 3–4 Tr. at 29.[3] Roth responded to DiLorenzo on January 20, 2012, with general information about the extradition process. Dkt. 79-8 at 2.

On January 27, 2012, in response to the Interpol diffusion, an official from the French Ministry of Justice—the French Central Authority for extradition matters—telephoned Roth about Demirtas's case. Aug. 3–4 Tr. at 31–32, 48.[4] Roth documented the conversation in a "memo to file," stating that her French counterpart had told her that "France can't act on" the "p[rovisional] a[rrest] request that's been diffused through Interpol" because the French "got [Demirtas] from the Netherlands on a European Arrest Warrant." Dkt. 79-8 at 7–8; *see also* Aug. 3–4 Tr. at 38, 60. Roth wrote that "[t]he Netherlands conditioned (as it always does) its surrender of a Dutch citizen (which, apparently, [Demirtas] is) . . . pursuant to a European Arrest

---

[3] In the parlance of international law, a "central authority" is the governmental entity designated to communicate with foreign governments (that is, with other countries' respective central authorities) regarding treaty obligations. Aug. 3–4 Tr. at 29; *see also* Restatement (Third) of Foreign Relations Law pt. IV ch. 7A, intro. note (1987).

[4] More specifically, the French official worked for the Bureau de l'entraide pénale internationale ("BEPI") within the French Ministry of Justice. Aug. 3–4 Tr. at 29, 31–32.

Warrant on the agreement of . . . France[] to return the person to the Netherlands to serve any

sentence imposed in . . . France[]." Dkt. 79-8 at 8.  According to Roth's memo,

> That means that if Demirtas is convicted here [in France], he gets shipped
> immediately to the Netherlands to serve the sentence there.  For that reason, France
> cannot authorize/approve his extradition to the States.  Because France will not
> extradite a guy while incarcerated in France on French charges (the situation now
> with his pretrial detention) and because they couldn't extradite him upon conviction
> ([because] he has to be returned to the Netherlands), the request for provisional
> arrest or extradition would be immediately denied.

*Id.*  Roth further explained that she had inquired about submitting a provisional arrest request as

"insurance" "in the event the case goes bust in France," but her French counterpart responded

that any such request would be denied and that, in any event, "there is a [ten-]day delay before

release from the date of any court decision that would result in his freedom, so [the U.S.

government would] have some time to get the [provisional arrest request] served." *Id.*  Finally,

Roth recounted that she had proposed contacting the French magistrate directly in order "to get a

better feel for the strength of the case and timing," but that her French counterpart had said she

"could not do that." *Id.*  Roth wrote that her counterpart's conclusion "make[s] little sense" and

"would leave them with no information at all." *Id.*

That same day, Roth's French counterpart emailed her "[t]o follow up on [their] phone

conversation." Dkt. 58-8 at 2.  The French official stated:

> [t]he French authorities cannot respond to [the U.S. Interpol diffusion], to the extent
> that Irfan Demirtas, a Dutch national, was given to us by the Netherlands as a part
> of a European arrest warrant, and France promised to return him to the Netherlands
> to execute the possible sentence. . . .
>
> France being committed to the Netherlands to return [him] . . . , it cannot give him
> to a different country which might ask for his return as part of either a European
> arrest warrant or an extradition request.  Besides, [the investigating magistrate] just
> told me that he thinks the judicial investigation should end from now until July
> 2012.  I wanted to let you know so that you could, if necessary, seek out the Dutch
> authorities in due course.

*Id*. In light of this information, Roth told DiLorenzo, who was preparing a French extradition package, to "put [his] pen down." Dkt. 79-8 at 5–6.

Notwithstanding the French official's admonition, Roth then contacted the French magistrate assigned to Demirtas's case. Aug. 3–4 Tr. at 35–36. On January 31, 2012, Roth emailed DiLorenzo to inform him that the magistrate had told her that the investigation needed to be finished by "May/June 2012"; that the trial would take place in late 2012 or early 2013; and that Demirtas was "sure to be convicted" and would "likely [receive a sentence of] 5–7 years." Dkt. 79-8 at 11; *cf.* Aug. 3–4 Tr. at 47, 50 (Roth's testimony of her recollection that, notwithstanding the foregoing, she was told that the investigation would end in July 2012). She also told DiLorenzo that "[t]here is no way that we can get him temporarily before trial" and that "[a]s you know, . . . you can't get him afterwards as he'll be shipped straight away to the Netherlands." Dkt. 79-8 at 11; *see also* Aug. 3–4 Tr. at 37. Roth suggested that DiLorenzo talk to Judith Friedman, a senior trial lawyer at OIA responsible for the Netherlands, "to find out whether the Dutch are typically amenable to giving us temporary surrender while the subject is doing time in their prison." Dkt. 79-8 at 11; *see also* Dkt. 71-1 at 1–2 (Friedman Decl. ¶¶ 1–3); Aug. 3–4 Tr. at 103. Roth copied Friedman on the email. *Id.*

In the same email, Roth added a note directed to Friedman. *Id.*[5] Roth explained that Demirtas was in the custody of the French pursuant to a European Arrest Warrant that included a "promise[] to remit the person to the Netherlands to serve any sentence imposed." Dkt. 79-8 at 11. She further stated that "France will not entertain an extradition request from us (they can't grant extradition while he's pending trial, and they won't have the body upon conviction)" and

---

[5] Roth testified that she had also "looped [Friedman] in a few days earlier" when she learned of the French promise to return Demirtas to the Netherlands. Aug. 3–4 Tr. at 44.

that DiLorenzo thus needed to "gear up to pursue extradition from the Netherlands when Demirtas is returned to them." *Id.*

Friedman replied later that day. *See* Dkt. 79-8 at 12. She explained that once Demirtas arrived in the Netherlands, his sentence would be "convert[ed]" to a Dutch sentence, which can be no longer than the French sentence, and that he would serve only two-thirds of the converted sentence. *Id.* Friedman stated that although "[t]he Dutch will do a temporary surrender[,] . . . extraditing a Dutch national generally takes about [one-and-one-half to two] years, so the timing may be such that a temporary surrender doesn't make sense." *Id.* Friedman also noted that, if the United States did obtain custody of Demirtas from the Netherlands, it would be conditioned on his return to the Netherlands to serve any sentence imposed by the U.S. court. *Id.* Finally, Friedman invited further questions. *Id.*

On April 19, 2012, DiLorenzo again touched base with Friedman and Roth, explaining his understanding that both France and the Netherlands would deny an extradition request while Demirtas was in French custody—France because "he [is] only on loan to them," and the Netherlands because "he is not present in [t]he Netherlands." Dkt. 79-8 at 15. DiLorenzo expressed frustration, stating, "We should be able to resolve this issue with our [two] allies. Any suggestions . . . ?" *Id.* Later that same day, DiLorenzo asked Friedman and Roth whether "France and [t]he Netherlands [would] consider lending [Demirtas] to [the United States] for trial," with any sentence imposed in the United States to be served in the Netherlands after the conclusion of the French case. *Id.* at 17. Roth responded that she had "already confirmed" that France would "not entertain" an extradition request in light of the promise to return Demirtas to the Netherlands. *Id.* at 18–22. Friedman, in turn, responded that obtaining a temporary surrender from the Dutch "can take [two] years." *Id.* at 20. In the course of this same email

chain, Friedman also flagged the risk that, "if the French are prosecuting [Demirtas] on the same fact pattern, the Dutch will claim double jeopardy." Dkt. 79-8 at 16. "Assuming that's not the case," she confirmed that "it does look like you'll have to wait until he returns to the Netherlands" to seek extradition. *Id.*

On June 1, 2012, the U.S. government issued an Interpol Red Notice seeking the provisional arrest of Demirtas "with a view to[ward] extradition." Dkt. 67-5 at 2.[6] Meanwhile, Roth and her successor as DOJ's Paris attaché continued to check in with their French counterpart to monitor the status of the French proceedings. Aug. 3–4 Tr. at 29, 52–54. In September 2012, the new attaché received word that Demirtas's trial was scheduled to begin that month. *Id.* at 53; Dkt. 79-5 at 3.

On September 6, 2012, DiLorenzo emailed Roth and Friedman, asking whether and where he could "move for [Demirtas's] extradition." Dkt. 79-8 at 23. Friedman replied that "it[] [was] not promising," because, after the French conviction, Demirtas would be sent back to the Netherlands and, "[i]f [the United States] ask[s] the Dutch for his extradition (since the Dutch will have to approve, even if we sent the request to the French), extradition will be denied if the facts are basically the same." *Id.* at 24. Roth in turn responded that she was no longer the DOJ attaché in Paris and copied her successor. *Id.* at 25. She reiterated France's position that it "cannot consider a U.S. extradition request [because] [France] [is] committed . . . to returning him to the Netherlands," adding, "[t]hus, your energies need to be focused on the Netherlands." *Id.* DiLorenzo then asked Friedman whether he could request Demirtas's extradition from the

---

[6] "An Interpol Red Notice alerts foreign governments to the issuance of a U.S. arrest warrant." *United States v. Tchibassa*, 452 F.3d 918, 923 n.3 (D.C. Cir. 2006). If another country locates the person sought within its territory, the Red Notice serves as a request for notification and, if the relevant country's domestic law and the applicable treaties permit, detention of the person pending a formal extradition request. Aug. 3–4 Tr. at 135; Dkt. 67-5 at 3.

Netherlands at that time, or whether he "ha[d] to wait until he is returned to [t]he Netherlands . . . ?" Dkt. 79-8 at 26. Friedman responded that "[r]equests can only go to where the body is." *Id.* at 34. DiLorenzo subsequently requested clarification as to whether she meant that DiLorenzo "ha[d] to wait until France is done," but Friedman did not respond. *Id.* at 35.

On January 25, 2013, the DOJ attaché in Paris (Roth's successor) again asked his French counterpart about the status of the French proceedings. Dkt. 67-2 at 6. The French official responded the same day, informing the attaché that on January 8, 2013, Demirtas had been convicted and sentenced to eight years' imprisonment. *Id.* at 7; *see also* Dkt. 78-6 (French judgment). Following this news, the U.S. government took no steps to extradite Demirtas from France. Aug. 3–4 Tr. at 88–89, 296; *see also* Dkt. 79-8 at 41–43.

Approximately six months later, on July 17, 2013, France returned Demirtas to the Netherlands. Dkt. 58-1 at 2. He was released the same day pending a September 24, 2013, Dutch hearing to "convert" the French sentence to a Dutch one—in essence, a procedural resentencing proceeding. Dkt. 58-1 at 2; Aug. 3–4 Tr. at 137.[7] On October 8, 2013, Demirtas was resentenced to time served—that is, to ninety months with early release after two-thirds served. Dkt. 58-1 at 2; Dkt. 71-1 at 11 (Friedman Decl. ¶ 19); Aug. 3–4 Tr. at 136–37. Accordingly, following his transfer to the Netherlands on July 17, 2013, Demirtas served no further time for the French conviction.

Pursuant to the Red Notice previously issued by the U.S. government, a Dutch official immediately informed Friedman of Demirtas's presence in the Netherlands and his release from

---

[7] Having already served approximately five years of the French sentence, Demirtas was released upon arrival in the Netherlands on the expectation that the Dutch court would resentence him to time served. Dkt. 58-1 at 2. He was not obligated to appear at the resentencing hearing. Dkt. 67-1 at 34; Dkt. 79-8 at 113.

custody.  Dkt. 67-1 at 8; Dkt. 71-1 at 7 (Friedman Decl. ¶ 10); Aug. 3–4 Tr. at 135.  The Dutch

official, who was Friedman's contact for complex extradition matters, served as a senior legal

advisor to the Dutch Minister of Security and Justice and as Deputy Director of the Office of

International Judicial Assistance within the Ministry of Security and Justice, which is the Central

Authority for the Netherlands.  Aug. 3–4 Tr. at 103, 244.  Upon learning of Demirtas's release,

Friedman told her Dutch contact, "I can confirm that we want him," but then, recognizing that

the U.S. extradition treaty with the Netherlands contains an exclusion in cases of "prior

jeopardy," qualified that "we don't want to ask for his arrest if it's going to be double jeopardy."

Dkt. 67-1 at 10, 12.

Prior jeopardy—also known as *non bis in idem*—is a concept incorporated in many

bilateral extradition treaties and in Dutch domestic law, which precludes extradition in certain

cases where the subject of the extradition request has previously been placed in "jeopardy" on

the same or similar charges.  *See, e.g.*, Dkt. 71-1 at 4–5, 7–8 (Friedman Decl. ¶¶ 6, 11);

Restatement (Third) of Foreign Relations Law § 476 (1987) ("Under most international

agreements . . . [a] person sought for prosecution . . . will not be extradited . . . if prosecution in

the requesting state would be, or was, in contravention of an applicable principle of double

jeopardy . . . .").  It is distinct from the prohibition on double jeopardy contained in the Fifth

Amendment to the U.S. Constitution, which does not apply to successive prosecutions by

"separate sovereigns."  *See Puerto Rico v. Sanchez Valle*, No. 15-108, slip op. at 6 (U.S. June 9,

2016) (citing *Heath v. Alabama*, 474 U.S. 82, 88 (1985)).

Between Demirtas's July 17, 2013, release in the Netherlands and early October 2013,

Friedman and her Dutch counterpart corresponded "dozens of times" about the need "to figure

out . . . whether [prior] jeopardy" would preclude Demirtas's extradition from the Netherlands to

the United States. Aug. 3–4 Tr. at 136–38; Dkt. 67-1 at 16–39. During this period, DiLorenzo and others were also attempting to obtain a copy of the French charges and verdict so that a prior jeopardy analysis could be performed. *See, e.g.*, Dkt. 79-8 at 73, 76, 78, 82–88, 91, 93, 95, 97, 116, 119, 126, 149–50, 200; Aug. 3–4 Tr. at 296. The acquisition of these documents was complicated by the fact that the French do not maintain an electronic docket, Dkt. 79-8 at 97, and that French officials required the United States to obtain an official order under the relevant Mutual Legal Assistance Treaty in order to access the court file, *id.* at 126.

Friedman's Dutch counterpart provided her with a summary of the French charges on September 20, 2013, *id.* at 108, and then, on October 2, 2013, Friedman sent her Dutch counterpart a summary of the United States's case against Demirtas, Dkt. 58-4 at 2. Friedman asked her Dutch counterpart to "review and advi[s]e as to whether any/all of the charges would be eligible for extradition." Dkt. 58-4 at 2. Within twenty-four hours, the contact replied:

> The chances of extradition appear slim to me.
>
> The overlap with the French conviction is considerable, and the time frame is exactly the same.
>
> The only difference seems to be the firearms charge, which is still strongly connected to the other charges for which he was tried in France.
>
> I strongly doubt the Dutch court will agree to the extradition based on these facts. Provisional arrest is unlikely anyhow, since he's Dutch and the possibility of extradition is far from certain.

Dkt. 67-1 at 44; *see also* Dkt. 71-1 at 3, 8 (Friedman Decl. ¶¶ 4, 13); Aug. 3–4 Tr. at 302.

Based on this Dutch official's opinion, Friedman "advised the U.S. prosecutors that there would be no reason to proceed with an extradition request . . . , as we could not prevail." Dkt. 71-1 at 8–9 (Friedman Decl. ¶ 14); *see also* Dkt. 79-8 at 174. And, although during September 2013 U.S. officials had been preparing a provisional arrest request, they halted their efforts after

hearing from Friedman.  Dkt. 79-8 at 138–39, 172; Aug. 3–4 Tr. at 298.  They did, however,

confirm that the June 2012 Red Notice remained in place in case Demirtas traveled to another

country.  Aug. 3–4 Tr. at 149; Dkt. 79-8 at 206.  U.S. law enforcement officials also asked their

Dutch contacts for assistance tracking Demirtas's movements, but that request was refused.

Aug. 3–4 Tr. at 153–54.  On January 29, 2014, Friedman requested a formalized statement of her

Dutch counterpart's opinion,  Dkt. 67-1 at 45–53; *see also* Dkt. 79-8 at 175 (DiLorenzo's October

3, 2013 request for a formalized statement "for speedy trial purposes"), which was provided on

March 4, 2014, Dkt. 67-1 at 52–53.  The U.S. government took no further action to obtain

custody of Demirtas while he remained in the Netherlands.  *See* Dkt. 67-1 at 45–53; Dkt. 78-8 at

41.

On January 12, 2015, Demirtas was arrested in a German airport pursuant to the Red

Notice.  Dkt. 24 at 4; Dkt. 79-8 at 228.  After contested extradition proceedings, Demirtas was

extradited to the United States on July 17, 2015.  Dkt. 67-3 at 5 (Carter Decl. ¶¶ 18–19).

## II.  PROCEDURAL BACKGROUND

Demirtas made his initial appearance before this Court on July 20, 2015.  On March 9,

2016, he moved to dismiss the indictment,  asserting that the lengthy delay between his

indictment and his initial appearance before this Court violated his constitutional right to a

speedy trial.  Dkt. 24.  The government filed its opposition to the motion to dismiss on April 25,

2016.  Dkt. 44.  The opposition relied solely on the declaration of an associate director of OIA

who lacked any personal knowledge of the U.S. government's efforts to obtain custody of

Demirtas.  Dkt. 44-1 at 2 (Carter Decl. ¶ 3) ("This affidavit is based upon my review of the records and files at OIA relating to this matter.").[8]

The Court initially held a hearing on the motion to dismiss on June 1, 2016.[9]  Although motions of the type at issue here are typically resolved after an evidentiary hearing, *see, e.g.*, *Tchibassa*, 452 F.3d at 923, the parties did not present any fact or expert witnesses at that hearing.  *See generally* June Tr.  Thus, although the government bears the burden of explaining any pre-trial delay, *see United States v. Fernandes*, 618 F. Supp. 2d 62, 68 (D.D.C. 2009), as of the June 1 hearing, the government had failed to offer any testimony (written or live) from anyone actually involved in its efforts to obtain custody of Demirtas from France, the Netherlands, or Germany.

In response to numerous factual questions posed by the Court at that hearing, the government requested the opportunity to make a supplemental submission.  The Court granted that request over Demirtas's objection, and it permitted Demirtas to make a further submission as well.  June Tr. at 159–61.  The government's supplemental submission included, however, only one further declaration:  a factual account by Friedman of her involvement in the matter.  That declaration addressed the proceedings against Demirtas only after he had been returned to the Netherlands in July 2013.  *See* Dkt. 71-1 (Friedman Decl.).  The government thus still had not submitted any evidence based on personal knowledge regarding the period of time during which

---

[8]  The defense put into evidence a handful of emails between U.S. and foreign officials, which it had obtained through discovery.  *See* Exhibits to Dkt. 58; Dkt. 67-1 at 1–56; Dkt. 67-2 at 1–15.

[9]  A number of other motions (filed by both defendant and the government) currently remain pending.  *See* Dkts. 25–30, 32–33, 56.  Although the Court originally scheduled a hearing on all pending motions, the parties made a joint request that the Court address the motion to dismiss on speedy trial grounds first and that hearings on the other motions be deferred pending resolution of the speedy trial issue.  *See* May 27, 2016 Min. Order.

Demirtas was in French or German custody.  Demirtas, in turn, submitted a declaration from an expert on Dutch extradition law, positing that the government could have extradited Demirtas from France with the consent of the Netherlands.  *See* Dkt. 73-2.

Given the fact-intensive nature of the relevant inquiry, the shortcomings in the then-existing record, and issues newly raised by Demirtas's supplemental submission, the Court concluded that an evidentiary hearing was warranted.  *See* Dkt. 74.  That hearing was held on August 3 and 4, 2016.  The government presented the testimony of Roth, Friedman, and Marcus Busch, an OIA official involved in the German extradition, as well as documentary evidence not previously offered.  *See generally* Aug. 3–4 Tr.; Dkt. 76.[10]  The defense, in turn, presented in-person testimony of its Dutch-law expert witness, Bart Stapert, but due to scheduling difficulties, its expert on French law, Joseph Breham, was unable to testify.  Aug. 3–4 Tr. at 94–99. Breham's direct testimony was accordingly offered in a declaration submitted on August 19, 2016.  Dkt. 80-2.  The government cross-examined Breham at a hearing held on August 26, 2016.  The Court permitted Demirtas to make a final submission addressing an issue of French and European Union law on August 29, 2016, and heard oral argument that same day.

The motion to dismiss for violation of Demirtas's Sixth Amendment right to a speedy trial, Dkt. 24, is, accordingly, now ripe for resolution.

---

[10]  During the cross-examination of Friedman on August 3, 2016, defense counsel uncovered that further undisclosed *Jencks* material existed.  *See* 18 U.S.C. § 3500 (Jencks Act); Fed. R. Crim. P. 26.2.  The cross-examination and other testimony were then continued to the following day.  Aug. 3–4 Tr. at 161–66.  Shortly before Friedman's cross-examination resumed, the government disclosed further 2016 communications to defense counsel.  Aug. 3–4 Tr. at 270, 280.

## III. ANALYSIS

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI.[11] "Excessive delay in prosecuting a defendant after he is indicted or arrested violates this Sixth Amendment right." *Tchibassa*, 452 F.3d at 922. "Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald*, 456 U.S. 1, 7 (1982) (citations omitted); *see also United States v. Marion*, 404 U.S. 307, 313 (1971). Here, Demirtas has not offered any argument or evidence in support of a Fifth Amendment due process claim, nor, as explained below, has he offered the type of affirmative evidence of prejudice necessary to sustain such a claim. *See United States v. Mills*, 925 F.2d 455, 464 (D.C. Cir. 1991), *modified on other grounds*, 964 F.2d 1186 (D.C. Cir. 1992) (en banc); *infra* pp. 56–57. Moreover, although Demirtas raises a statute of limitations argument in a separate motion, Dkt. 56, he does not press that defense here. And, finally, the pending motion does not invoke the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. Thus, for present purposes, the sole question is whether the more than three-and-a-half year delay between

---

[11] Although Demirtas was outside the United States at the time of the indictment, the government treats the Sixth Amendment right as attaching upon indictment, and neither party offers any argument to the contrary. The Court, accordingly, assumes that Demirtas was entitled to a speedy trial from the time of the indictment onward. *Cf. Tchibassa*, 452 F.3d at 921 n.1 (assuming *arguendo* that "the Sixth Amendment speedy trial right attaches to a foreign national—charged with a crime committed outside United States territory—while he remains outside our borders"); The Honorable Karen Nelson Moore, *Aliens and the Constitution*, 88 N.Y.U. L. Rev. 801, 833–34 (2013) (noting that although "one federal court has concluded that that the right to a speedy trial does not attach before the alien-defendant enters the United States," other courts have held or assumed the opposite).

Demirtas's indictment and his initial appearance before this Court constitutes excessive delay for purposes of the Sixth Amendment.

The evaluation of a Sixth Amendment speedy trial claim involves a detailed, fact-intensive inquiry in which the Court must balance multiple factors, which include the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "[N]one of [these] factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. Of these factors, however, "[t]he flag all litigants seek to capture is the second factor, the reason for the delay." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986); *see also Fernandes*, 618 F. Supp. 2d at 67 ("[T]he second factor—who is to blame for the delay—often dictates the outcome of cases."). The Court addresses in turn each of the four factors identified in *Barker v. Wingo*.

A.      **Length of Delay**

The first *Barker* factor—length of delay—"entails 'a double enquiry': First, '[s]imply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay. . . . " *Tchibassa*, 452 F.3d at 923 (first alteration in original) (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)). "[P]ostaccusation delay" crosses this threshold "at least as it approaches one year." *Doggett*, 505 U.S. at 652 n.1; *see also United States v. Jones*, 524 F.2d 834, 849 (D.C. Cir. 1975) ("We have said that cases involving delays of more than six months are properly subject to inquiry and require justification."). Here, the delay between Demirtas's indictment on December 8, 2011, and his initial appearance before this Court on July 20, 2015,

was over forty-three months.  The Court, accordingly, must apply the *Barker* factors to determine whether Demirtas's Sixth Amendment right to a speedy trial has been violated.

Second, "once the accused makes this threshold showing, 'the [C]ourt must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.'" *Tchibassa*, 452 F.3d at 923 (quoting *Doggett*, 505 U.S. at 652)).  Here, the over three-and-a-half year delay was, to use the government's words, "unquestionably substantial," Dkt. 44 at 15, albeit shorter than the "well over five[-]year" delay deemed "extraordinary" in *Barker*, 407 U.S. at 533–34, or the eight-and-a-half-year delay deemed "far" in excess of the threshold in *Doggett*, 505 U.S. at 658.  At any rate, "[a]s a practical matter, once the threshold of more than one year is exceeded, the length of the delay does not strongly sway the ultimate outcome of the speedy trial issue." *Fernandes*, 618 F. Supp. 2d at 68 (explaining that the D.C. Circuit has held "an *eleven-year* delay was outweighed by" the defendant's fault, while "in contrast, when a delay is the fault of the government, courts have held that delays as short as *two years* are unconstitutional" (citations omitted)).  The significance of the length of the delay, moreover, cannot be assessed in the abstract, without first determining what portion of that delay, if any, is "attributable" to the government.  *See Doggett*, 505 U.S. at 657–58.  Hence, the Court must consider the magnitude of the delay in the relevant context.

**B.      Reason for the Delay**

"Closely related to length of delay is the reason the government assigns to justify the delay." *Barker* 407 U.S. at 531.  "The government 'has an affirmative constitutional obligation to try the defendant in a timely manner, and thus, the burden is on the prosecution to explain the cause of the pre-trial delay.'" *Fernandes*, 618 F. Supp. 2d at 68 (quoting *United States v.*

16

*Graham*, 128 F.3d 372, 374 (6th Cir. 1997)).  It is thus the government's burden to show that it

pursued the defendant "with reasonable diligence from his indictment to his arrest." *Id.* (quoting

*Doggett*, 505 U.S. at 656 (internal quotation mark omitted)).  That is, the "government . . . has a

'constitutional duty to make a diligent, good-faith effort' to locate and apprehend a defendant

and bring the defendant to trial." *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986)

(quoting *Smith v. Hooey*, 393 U.S. 374, 383 (1969)).

   "[W]here a defendant is located abroad, . . . the hallmark of government diligence is

extradition." *Fernandes*, 618 F. Supp. 2d at 69.  If "the United States has a valid extradition

treaty in place with a foreign country and prosecutors formally seek extradition . . . , courts

routinely hold that the government has satisfied its diligence obligation." *Id.* (citing *Tchibassa*,

452 F.3d at 925).  At the same time, however, good-faith, diligent efforts "do not require the

government to pursue futile legal gestures." *Bagga*, 782 F.2d at 1543; *see also, e.g.*, *United

States v. Heshelman*, 521 F. App'x 501, 507 (6th Cir. 2013); *United States v. Corona-Verbera*,

509 F.3d 1105, 1114 (9th Cir. 2007); *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988);

*United States v. Walton*, 814 F.2d 376, 379–80 (7th Cir. 1987).  The government can accordingly

carry its burden of establishing "due diligence" by showing that it had "a good[-]faith belief

supported by substantial evidence that seeking extradition from a foreign country would be

futile." *Corona-Verbera*, 509 F.3d at 1114; *see also Blanco*, 861 F.2d at 778; *Fernandes*, 618 F.

Supp. 2d at 69.  "Similarly, the government usually satisfies its diligence obligation if it shows

that it attempted extradition informally." *Fernandes*, 618 F. Supp. 2d at 69.  Thus, courts have

"held that the government was sufficiently diligent for Sixth Amendment purposes" where it

"informally contacted Swedish officials on numerous occasions" and was informed that

extradition was not possible, *id.* (citing *Walton*, 814 F.2d at 379), or where the government

"'procur[ed] an agreement from Dominican officials to notify the [government] prior to [defendant's] release' from a Dominican jail," *id.* (quoting *United States v. Valencia-Quintana*, 136 F. App'x 707, 709–10 (5th Cir. 2005)).

However the government proceeds, the Court must evaluate "the reason . . . for the delay" along a continuum. *Barker*, 407 U.S. at 531. At one end of the spectrum, "[a] deliberate attempt to delay the trial in order to hamper the defense" or to "gain some tactical advantage" "[must] be weighted heavily against the government," while, at the other end, "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* at 531 & n.32. In the middle of the spectrum lie "more neutral reason[s] such as negligence or overcrowded courts." *Id.* at 531. And although "the ultimate responsibility for such circumstances [as negligence] . . . must rest with the government," *id.* at 531, the Court must evaluate the specific facts in the context of the other *Barker* factors to assess how heavily to weight any such shortcoming.

In analyzing the second *Barker* factor, the Court will proceed mostly, but not entirely, in chronological order. First, the Court will address the initial thirteen months subsequent to Demirtas's indictment that he spent in French custody pending the French prosecution. It will then skip ahead to the eighteen months after Demirtas was returned to the Netherlands. Next it will analyze the additional six months that Demirtas spent in French custody after his French conviction but before his release in the Netherlands. This chronological detour is useful because Demirtas's theory of why the government should have sought his extradition from France subsequent to his conviction turns, in part, on principles of prior jeopardy that are more clearly framed by assessing the government's subsequent decision not to seek his extradition from the Netherlands. Finally, the Court will address the sixth months immediately preceding Demirtas's removal from Germany to the United States, while he was in German custody.

1.      *Detention Pending Prosecution in France: Dec. 8, 2011 to Jan. 8, 2013*

Shortly after Demirtas's indictment on December 8, 2011, the government promulgated

an Interpol diffusion seeking custody of Demirtas, and it began preparing to request his

extradition from France. *See* Dkt. 58-8 at 3; June Tr. at 6; Dkt. 79-8 at 2. Those efforts,

however, were almost immediately rebuffed by the French official responsible for extradition

matters involving the United States. On January 27, 2012, that official informed Roth, the

responsible U.S. official, that France would not authorize or approve Demirtas's extradition

"while [he was] incarcerated in France on French charges." Dkt. 79-8 at 8. Roth, moreover,

directly inquired of her French counterpart whether the United States "could borrow

[Demirtas]"—that is, "interrupt the French proceeding"—so that Demirtas could stand trial in the

United States. Aug. 3–4 Tr. at 34. The French official responded that France would not

entertain such a request. *Id.* He explained to Roth that, even absent France's promise to return

Demirtas to the Netherlands upon conviction, the French would not interrupt their own

proceedings to extradite Demirtas to the United States. *Id.* And, although that answer was "no

real surprise," *id.*, Roth confirmed with the French magistrate assigned to Demirtas's case "that

there was no way the United States would be able to get [custody] of [Demirtas] during the

pendency of the French proceeding," *id.* at 37.[12] In sum, according to Roth's testimony, the

French "made it clear [to her] on multiple occasions that they would not honor a U.S. request for

---

[12] The Court finds the fact that Roth made inquiries of the magistrate probative of whether the
government proceeded diligently, notwithstanding the fact that the French magistrate was
responsible only for the investigation of Demirtas and was independent of the Ministry of
Justice—the Central Authority for France with authority over extradition matters. Aug. 3–4 Tr.
at 37. The magistrate's opinion as to the likelihood of extradition during the French proceedings
confirmed the view already expressed by a French representative of the more relevant
decisionmaking body, the BEPI within the Ministry of Justice. *See* Dkt. 79-8 at 8; *supra* n.4.

[Demirtas's] extradition . . . during the pendency of the French investigation[.] . . . There was no uncertainty whatsoever in the communications from the French to [her] on that." *Id.* at 56.

In light of the foregoing, the government had no duty to make a formal request for extradition while the French prosecution was ongoing. Foreign "officials [had] made clear that they would not grant an extradition request." *Blanco*, 861 F.2d at 778 (citing *Walton*, 814 F.2d at 379). And, when "[d]rawing a line between intentional delays that are permissible and those that are impermissible, . . . deferring prosecution because of an ongoing trial by another sovereign" falls on the permissible side of the line. *Heshelman*, 521 F. App'x at 509. The government has, accordingly, established that it had "a good[-]faith belief supported by substantial evidence that seeking extradition from" France while the French prosecution was ongoing would have been "futile." *Corona-Verbera*, 509 F.3d at 1114.

Demirtas responds that this case is analogous to *United States v. Pomeroy*, 822 F.2d 718 (8th Cir.1987), in which the Eighth Circuit held that the government was not reasonably diligent when it failed to request the defendant's extradition from Canada, even though Canadian criminal proceedings were underway at the time. *See* Dkt. 58 at 19–20 (citing *Pomeroy*, 822 F.2d at 719–21). Demirtas's case, however, is distinguishable from *Pomeroy* in at least one crucial respect: Although both the extradition treaty at issue in *Pomeroy* and the extradition treaty between the United States and France leave the matter of temporary surrender during the pendency of a prosecution to the discretion of the requested state, *compare Pomeroy*, 822 F.2d at 721 & n.7, *with* Dkt. 85-1 at 24–25 (*Extradition Treaty with France, France-U.S.*, art. 16, Apr. 23, 1996); Dkt. 80-2 at 6 (Breham Decl.),[13] in *Pomeroy*, unlike in this case, "there [was] nothing

---

[13]   As relevant here, the U.S.-French extradition treaty provides:

in the record to indicate [that the Canadians] would have [exercised their discretion to deny extradition] had a proper request been made by the Government," 822 F.2d at 721–22.  In *Pomeroy*, the government had simply "held [Pomeroy's] extradition request 'in abeyance' pending completion of his Canadian sentence," without ever inquiring of Canadian officials whether a surrender to the United States was possible during service of that sentence.  *Id.* at 719.[14]  In contrast, in this case, Roth asked the French on multiple occasions whether the United States could interrupt the French proceedings and bring Demirtas to the United States for prosecution, and those requests were unambiguously refused.  *See* Aug. 3–4 Tr. at 56.  Thus, even though the extradition treaty between the United States and France may indeed have

---

1.  If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the Requested State, the Requested State *may* temporarily surrender the person sought to the Requesting State for the purpose of prosecution.  The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting States.

2.  The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded and any sentence has been served.

Dkt. 85-1 at 24–25 (*Extradition Treaty with France, France-U.S.*, art. 16, Apr. 23, 1996) (emphasis added).

[14]  In *Pomeroy*, Canadian officials had apparently told the U.S. government that they would exercise their discretion to deny extradition pending a retrial of Pomeroy after his Canadian conviction was reversed on appeal.  822 F.2d at 719.  Although the Eighth Circuit did not expressly discuss that evidence, it appears that its holding was premised on the failure of the U.S. officials to seek extradition *pending the appeal* that precipitated the new trial.  That is, while there appears to have been some evidence that the Canadians would have denied extradition *during the course of the new trial*—evidence not elaborated upon by the Eighth Circuit—there was no evidence that Canada would have denied extradition pending the appeal of Pomeroy's original conviction.  *Id.*

*permitted* France to interrupt its prosecution to extradite Demirtas, there was substantial evidence that France would have exercised its discretion to deny such a request.

The Supreme Court's decision in *Smith v. Hooey*, 393 U.S. 375 (1969), is distinguishable for the same reason. In that case, the Supreme Court reversed a denial of mandamus on a speedy trial question where "the State [of Texas] took no steps to obtain" custody of the petitioner, who was serving a federal sentence, *id.* at 375, notwithstanding the fact that the federal "Bureau of Prisons would doubtless have made the prisoner available" had "the State at any point sought to initiate [the] procedure" for bringing him before its courts, *id.* at 381 (internal quotation marks omitted). Here, in contrast, the government took appropriate steps to ascertain whether the French were amenable to surrender of Demirtas during the course of the French prosecution and learned that they were not.

In short, the U.S. government did not fail to file an extradition request with a foreign government that was cooperative and willing to extradite. *Cf. Heshelman*, 521 F. App'x at 508. Where, as here, the relevant extradition treaty "left the extradition question to the discretion of appropriate [foreign] officials," and informal communications with those officials "reveal[ed] [that they had] no interest in extraditing" the defendant, "a formal request for extradition" was not required to establish due diligence. *Walton*, 814 F.2d at 379; *see also Valencia-Quintana*, 136 F. App'x at 708–09 (noting defendant's concession that delay attributable to defendant's "arrest and incarceration in the Dominican Republic" was not even "arguably attributable to a lack of diligence on the part of the government" where "Dominican authorities denied the [government's] request to have [the defendant] released into United States custody[, even though] no formal extradition request was ever filed"). And, even if the government might have

22

more aggressively demanded that the French interrupt the French case, reasonable diligence did not require them to do so.

The government, moreover, did not simply abandon efforts to obtain custody of Demirtas after learning that the French would not extradite him while the French prosecution was ongoing. Instead, Roth asked whether France would or could provisionally arrest Demirtas as "insurance" so that he would not be released if the French case "[went] bust," but she was informed that such a request would be denied. Dkt. 79-8 at 8; Aug. 3–4 Tr. at 34. The U.S. government also kept in periodic contact with the French regarding the status of the proceedings, and disseminated through Interpol a Red Notice seeking Demirtas's detention, *see* Dkt. 67-2 at 6; Dkt. 67-5 at 2; Dkt. 79-5 at 3; Aug. 3–4 Tr. at 51–54—further evidence that it was earnestly pursuing Demirtas, *see United States v. Vasquez-Uribe*, 426 F. App'x 131, 133–34, 138 (3d Cir. 2011) (finding government reasonably diligent where it deferred to joint ongoing investigation of defendant's activities in Colombia and, instead of pursuing extradition from Columbia, "took alternative measures to attempt to locate [the defendant] internationally and to ensure he would be detained if he were to travel within the United States"); *United States v. Wangrow*, 924 F.2d 1434, 1437 (8th Cir. 1991) (holding no speedy trial violation where government requested deportation of defendant to United States "as soon as [foreign charges were] resolved" and "remained in periodic contact with [foreign] officials regarding [defendant]").

The Court, accordingly, finds that the government did not fail to exercise due diligence in pursuing Demirtas during the thirteen-month period in which he was incarcerated in France while the French proceeding was ongoing.

2.      *Time in the Netherlands: July 17, 2013 to approximately Jan. 12, 2015*

Skipping ahead to the period of time after Demirtas was released in the Netherlands, the government has also established that, at that juncture, it had "a good[-]faith belief supported by substantial evidence that seeking extradition from [the Netherlands] would be futile," *Corona-Verbera*, 509 F.3d at 1114—initially due to the pendency of a Dutch resentencing proceeding, and then because prior jeopardy precluded Demirtas's extradition from the Netherlands.

a.      Pending Dutch Resentencing: July 17, 2013 to Oct. 8, 2013

Upon arrival in the Netherlands on July 17, 2013, Demirtas was released pending Dutch proceedings to "convert" his French sentence to a Dutch one, a procedural resentencing that generally shortens the sentence imposed. Dkt. 58-1 at 2; Aug. 3–4 Tr. at 136–37. Friedman, who was the OIA official responsible for extraditions from the Netherlands, averred that the United States could not have obtained custody of Demirtas while this resentencing procedure was ongoing. Dkt. 71-1 at 11 (Friedman Decl. ¶ 19). Demirtas's own expert witness on Dutch law, Bart Stapert, agreed with this assessment. Aug. 3–4 Tr. at 419–20.

As Stapert explained, Article 9(1) of the Dutch Extradition Act barred extradition while the Dutch resentencing proceeding was underway. *Id.* Under Article 9(1), extradition "will not be permitted" if, "at the time of the decision for the request for extradition[,] a criminal investigation in the Netherlands is underway." Dkt. 78-14 at 10 (email providing English translation of Art. 9(1)). And, according to Stapert, although the Dutch proceeding was a procedural resentencing rather than a prosecution, it was nonetheless a criminal proceeding covered by Article 9(1). Aug. 3–4 Tr. at 419–20. There is thus substantial evidence to support the government's good-faith belief that extradition would have been futile while the Dutch

resentencing was pending—that is, from Demirtas's arrival in the Netherlands on July 17, 2013,

Dkt. 58-1 at 2, until the conclusion of the resentencing on October 8, 2013, Aug. 3–4 Tr. at 137.

      b.    <u>Remaining Time in the Netherlands: Oct. 8, 2013 to about Jan. 12, 2015</u>

     The government also had a good-faith belief supported by substantial evidence that after

October 8, 2013, extradition from the Netherlands would have been futile because the Dutch law

of prior jeopardy barred Demirtas's extradition.   Article 5 of the extradition treaty between the

United States and the Netherlands provides that

> [e]xtradition shall not be granted when: (a) The person sought is being proceeded
> against, has been prosecuted, or has been tried and convicted or acquitted by the
> Requested State for the offense for which extradition is requested; or (b) The person
> sought is otherwise immune from prosecution for the offense for which extradition
> is requested by reason of the law in the Requested State relating to prior jeopardy.

Dkt. 78-12 at 7.[15]  Because subpart (a) applies only to Dutch convictions, it would not have

posed a bar to extradition from the Netherlands based solely on Demirtas's French conviction.

*See* Aug. 3–4 Tr. at 119–20, 282–83.  All agree, however, that subpart (b) applies to all offenses

for which prior jeopardy would attach as a matter of Dutch law, including offenses prosecuted in

foreign jurisdictions.   *See* Aug. 3–4 Tr. at 119–20, 282–83, 372–74.  And, as both Friedman and

Stapert testified, under Article 68(2) of the Dutch Criminal Code, Demirtas's French conviction

qualified as a prosecution to which jeopardy would attach under appropriate circumstances and

at an appropriate time.  Dkt. 71-1 at 5 n.2, 9 (Friedman Decl. ¶¶ 6, 15); Aug. 3–4 Tr. at 114,

281–82, 374–75.  The same is true, moreover, under Article 9(1)(D)(1) of the Dutch Extradition

Law.  Dkt. 73-2 at 2 (Stapert Decl.); Aug. 3–4 Tr. at 372–73.

---

[15] *Agreement Comprising the Instrument as Contemplated by Article 3(2) of the Agreement on
Extradition Between the United States of America and the European Union as to the Application
of the Extradition Treaty Between the United States of America and the Kingdom of the
Netherlands Signed at The Hague on 24 June 1980*, art. 5, Sept. 29, 2004.

As explained below, the parties disagree about when jeopardy attaches under these rules—Friedman testified that jeopardy attaches upon conviction, while Stapert testified that under Dutch domestic law jeopardy attaches with respect to a foreign conviction only after the defendant has fully served his sentence.[16] For present purposes, however, this dispute is immaterial. All agree that jeopardy attached *no later than* October 8, 2013, when the Dutch court reduced Demirtas's sentence to time served. Accordingly, with respect to the period of time following October 8, 2013, when Demirtas remained in the Netherlands, prior jeopardy would have precluded his extradition to the United States if the French and U.S. charges were sufficiently similar to trigger Dutch principles of prior jeopardy.

The question, then, is whether the government had a good-faith belief supported by substantial evidence that, under Dutch law, the French and U.S. cases were indeed sufficiently similar to preclude Demirtas's extradition. The Court finds that it did. Between Demirtas's release in the Netherlands on July 17, 2013 and early October 2013, Friedman and her Dutch counterpart corresponded "dozens of times" about whether Demirtas's extradition from the Netherlands would be barred by prior jeopardy. Aug. 3–4 Tr. at 136, 138; Dkt. 67-1 at 16–43; Dkt. 71-1 at 7 (Friedman Decl. ¶ 11). Then, on October 3, 2013, Friedman's Dutch counterpart advised her that "the chances of extradition appear[ed] slim" because of the "considerable" "overlap with the French conviction" and the fact that "the time frame [of the offense conduct] is exactly the same." Dkt. 67-1 at 44. He explained that even though the U.S. firearms charge appeared different, it was "still strongly connected to the other [French] charges." *Id.* Under the

---

[16] *Compare* Aug. 3–4 Tr. at 114–15 (Friedman's testimony that jeopardy attached to French conviction when that conviction became final on January 8, 2013), *with* Aug. 3–4 Tr. at 411 (Stapert's testimony that jeopardy attached at the conclusion of the Dutch resentencing proceeding on October 8, 2013, when service of the French sentence was complete).

circumstances, the Dutch official opined that he "strongly doubt[ed] the Dutch court w[ould] agree with an extradition based on these facts." *Id.* Based on this opinion from a responsible Dutch official and her own experience, Friedman believed that an extradition request would be futile, and she so advised U.S. prosecutors. Dkt. 71-1 at 8 (Friedman Decl. ¶ 14); *see also* Dkt. 79-8 at 174.[17]

The Court finds that the opinion of Friedman's Dutch contact was indeed important and reliable evidence of whether an extradition request would be futile. The Dutch official in question was a legal advisor to the Dutch Minister of Security and Justice, as well as the deputy director of the Dutch version of OIA. Aug. 3–4 Tr. at 105. He was responsible for advising the Minister of Security and Justice on the legal issues surrounding extraditions, particularly in complex cases, and had worked on Dutch extradition matters for at least fifteen years. *Id.* at 104–05, 244; Dkt. 71-1 at 3 (Friedman Decl. ¶ 4). Indeed, Stapert, the defense's Dutch-law expert, personally knew Friedman's Dutch counterpart and confirmed that he was "absolutely" a competent expert on Dutch extradition law. Aug. 3–4 Tr. at 391, 428.

---

[17] Friedman requested a more formal letter memorializing the Dutch official's assessment of the likelihood of extradition. In response, the Dutch Ministry of Justice provided a letter, dated March 4, 2014, stating:

> These charges do not appear to be eligible for extradition, mainly given the French conviction with which there is a considerable overlap. The time frame in which the offences took place is also exactly the same. It is therefore likely that the Dutch court will not allow extradition based on these facts due to double jeopardy.

Dkt. 67-1 at 53. It was the earlier October 2013 opinion of Friedman's Dutch contact that Friedman relied upon, however, in forming her belief that a formal extradition request would be futile and in calling off efforts to pursue such a request. Dkt. 71-1 at 8 (Friedman Decl. ¶ 14); *see also* Dkt. 79-8 at 174. The Court's discussion of whether the government had a good-faith belief supported by substantial evidence that extradition would be futile accordingly focuses on the Dutch official's October 2013 assessment.

When Friedman learned that this Dutch official had concluded that chances were "slim" that Demirtas was subject to extradition, she was not merely receiving a prediction from an expert on Dutch extradition matters as to how a Dutch court might rule on a formal extradition request. She was also receiving guidance as to whether such a request was likely to be submitted to the Dutch court and approved by the Minister of Security and Justice. In the Netherlands, the Ministry of Security and Justice is responsible for filing extradition requests in Dutch court on behalf of the United States, but it is not required to do so if it believes that the request fails to comply with the Netherland's legal obligations. *Id.* at 441. And, even if a Dutch court grants extradition, the Minister of Security and Justice—to whom Friedman's Dutch contact served as a legal adviser—retains final authority over whether to grant extradition. *Id.* at 388–89. Thus, the Dutch official's opinion was also strong evidence that the Dutch Ministry of Security and Justice and/or the Dutch Minister himself would deny an extradition request.

Friedman's counterpart obtained information from the Dutch prosecutors and was aware of the offenses charged by France and the United States, as well as the fact that both sets of charges pertained to Demirtas's alleged association with the IMU between 2006 and 2008. *See* Dkt. 79-8 at 108 (Dutch contact's summary of information that he received from the Dutch prosecutor assigned to the resentencing); Dkt. 58-4 at 2–6 (Friedman email attaching three-page summary of U.S. charges). As explained below, this was precisely the kind of information relevant to an assessment of the case under Dutch principles of prior jeopardy. And, importantly, Friedman's Dutch counterpart neither asked her for further information nor qualified his assessment as based on incomplete information. Although Demirtas suggests that the Dutch official's quick response to Friedman's request for his opinion—given within twenty-four

hours—indicates a cursory answer, Aug. 3–4 Tr. at 302, it is more likely that the answer was given quickly simply because it was straightforward.

Although Friedman's Dutch contact spoke in terms of probabilities, telling her that the "chances of extradition appear[ed] slim," Dkt. 67-1 at 44, Friedman reasonably understood him to be telling her "that a request for the extradition of the defendant in this case would be denied." Dkt. 71-1 at 8 (Friedman Decl. ¶ 13). Friedman testified that even though the email from the Dutch official said only that the chance of extradition was "slim," she was confident that her counterpart "meant we were not going to get him." Aug. 3–4 Tr. at 144–45. Based on her over fifteen-year professional relationship with this official—a relationship that "involve[d] almost daily written and/or telephone discussions related to requests for legal assistance and extraditions," Dkt. 71-1 at 3, 8 (Friedman Decl. ¶¶ 4, 13)—Friedman understood him to be using "diplomatic speak" that was a "polite" way of saying that extradition was "not going to happen," Aug. 3–4 Tr. at 145. And because her "Dutch contact [was] a good law enforcement partner of the United States," Friedman was "confident that if there had been any realistic chance of successfully extraditing the defendant, even if it had been on only some of the charges, [he] would have so advised [her]." Dkt. 71-1 at 8 (Friedman Decl. ¶ 13). The Court finds no reason to doubt that Friedman in good faith (and for good reason) believed that her Dutch contact intended to convey to her that an extradition request would be refused. Moreover, although admittedly after-the-fact and generated in the context of the present litigation, Friedman's counterpart confirmed in a July 2016 email that she correctly understood him to have opined that "a request for extradition would not [have stood] a chance" and that she was "sufficiently experienced to get [that] message." Dkt. 78-14 at 1. He added that he "wanted to discourage" Friedman from filing a request for extradition, because his office "probably" would not have

even been willing to go to "court with" an extradition request in light of the "double jeopardy obstacles." *Id.*

Importantly, in forming her assessment that a formal extradition request would be futile, Friedman did not rely on the Dutch official's statement that "the chances are slim" in a vacuum; the Dutch official's assessment accorded with Friedman's own experience. Friedman has served as the OIA official responsible for legal assistance and extradition requests involving the Netherlands for twenty-two years and has worked on approximately 500 extraditions involving the Netherlands. Dkt. 71-1 at 2, 3 (Friedman Decl. ¶¶ 3, 5); Aug. 3–4 Tr. at 102, 106. In that capacity, she has "become very familiar with the [t]reaties and Dutch policy regarding" extradition of Dutch nationals and the implications of prior jeopardy law, Dkt. 71-1 at 3–6 (Friedman Decl. ¶¶ 5, 7, 9), and was aware of a number of cases in which prior jeopardy precluded the extradition of fugitives, *id.*

As Friedman testified—and as Stapert confirmed—Dutch prior jeopardy law is "much more expansive" than U.S. double jeopardy doctrine. Aug. 3–4 Tr. 107, 407 (Stapert's testimony that Dutch prior jeopardy is "much broader" than U.S. double jeopardy). Unlike U.S. double jeopardy doctrine, which examines whether two offenses have the same legal elements and which does not bar successive prosecutions by separate sovereigns, *see Blockburger v. United States*, 284 U.S. 299 (1932); *Heath v. Alabama*, 474 U.S. 82, 88 (1985), Dutch prior jeopardy law considers the degree to which the underlying conduct at issue is the same and, if it is sufficiently similar, bars a successive prosecution even by a separate sovereign, Aug. 3–4 Tr. at 108–09, 407–08; Dkt. 71-1 at 9 (Friedman Decl. ¶ 15). Friedman testified that, accordingly, "[t]he fact that [the U.S. charges] were focusing on harm to U.S. citizens . . . was not a relevant" means of distinguishing the U.S. case from the French conviction, because the conduct charged

in France and the United States "was all part of the same pattern and the same criminal activity." Aug. 3–4 at Tr. 143–44. Thus, when Friedman's Dutch counterpart opined that the chances of extraditing Demirtas "appear[ed] slim," Dkt. 67-1, at 44, his opinion accorded with her own "experience that [where] the totality of the facts are similar and occur during the same time frame," Article 5 of the U.S.-Dutch extradition treaty precludes extradition, Dkt. 71-1 at 9 (Friedman Decl. ¶ 15).

Yet, even assuming that the Dutch official's opinion was indeed merely a statement that it was highly probable, rather than certain, that extradition from the Netherlands would be denied, the relevant legal question is whether the U.S. government had a good-faith belief, supported by substantial evidence, that extradition would be futile—and not whether extradition was in fact impossible. *See, e.g.*, *Corona-Verbera*, 509 F.3d at 1115 (holding government established futility where there was "[s]ubstantial evidence . . . that extradition from Mexico on drug related charges prior to 2002 was *extremely rare*" (emphasis added)); *Bagga*, 782 F.2d at 1543 (holding that government established futility where there was "great doubt" that the offense was "extraditable"). Such certainty could be obtained only by formally requesting that the foreign law enforcement partners of the United States pursue extradition litigation, even where those officials have concluded, based on their experience and expertise, that the litigation stands little chance of success. Such a requirement cannot be squared with settled law holding that informal communications generally suffice to establish the government's reasonable diligence, *see, e.g.*, *Walton*, 814 F.2d at 379; *Fernandes*, 618 F. Supp. 2d at 69, and, indeed, could prove counterproductive by undermining the working relationships necessary to foster international cooperation and by imprudently alerting criminal defendants to otherwise sealed proceedings. Here, the Court finds that Friedman's informal communications with her Dutch counterpart and

her own experience constituted substantial evidence supporting her belief, held in good faith, that a formal request for extradition would be denied.

The Court rejects Demirtas's characterization of the government's failure to seek his extradition from the Netherlands as "neglect or a purposeful attempt to gain a tactical advantage." Dkt. 24 at 8; *see also* Dkt. 58 at 7 (alleging "bad faith and a lack of diligence"). According to Demirtas, by failing formally to request extradition, "the government sought to avoid its obligations under" the U.S.-Dutch extradition treaty with respect to prior jeopardy and to deprive Demirtas of his right, as a Dutch citizen, to seek asylum in the Netherlands. *See* Dkt. 58 at 13, 21. He also suggests that the government did not seek extradition from the Netherlands because the U.S.-Dutch extradition treaty would have permitted Demirtas to return to the Netherlands following a U.S. conviction, where his sentence would be shortened. Aug. 3–4 Tr. at 79, 308–09; *see also* Dkt. 79-8 at 12. According to this theory, by waiting to see if Demirtas could be apprehended by the United States in some other manner, the government hoped to avoid these conditions applicable to an extradition from the Netherlands.

It is true that where the government fails to seek extradition for the purpose of hampering the defense, the delay "should be weighted heavily against the government." *Barker*, 407 U.S. at 531. At least one court, moreover, has applied this rationale where the government "deliberately chose not to extradite sooner because it wanted to ensure that [defendant] could be tried" on all of the charged counts. *Heshelman*, 521 F. App'x at 506–09. Here, however, the record substantiates that the government earnestly desired to extradite Demirtas from the Netherlands. Friedman spoke with her Dutch counterpart somewhere between twenty and thirty times between July 17, 2013, and early October 2013 to discuss "potential alternatives" for proceeding against Demirtas. Aug. 3–4 Tr. at 317. She asked her Dutch counterpart, for example, whether "*any*/all

of the charges would be eligible for extradition," Dkt. 58-4 at 2 (emphasis added), and whether it was possible to "cull out the firearms charge" to avoid the prior jeopardy problem, Aug. 3–4 Tr. at 317. But her counterpart responded that "the gun charge was . . . part of the entire pattern for the same timeframe." *Id*. at 139. And, although Friedman mentioned in passing to other U.S. officials that extradition from the Netherlands would ultimately result in a reduction of any U.S. sentence imposed, she testified that this was "not a consideration" and was "absolutely separate" from the analysis of whether he could be extradited. *Id*. at 319–20. The Court credits that testimony. In short, there is no credible evidence that the government deliberately delayed seeking extradition for any tactical—or any other—purpose.

The Court, accordingly, finds that the government held a good-faith belief that a formal extradition request to the Netherlands would be denied. It also finds that that belief was backed by substantial evidence—the opinion of a senior Dutch official with both expertise and significant influence over the disposition of extradition decisions, and Friedman's own opinion, based on her twenty-two years of experience working on Dutch extradition matters. The government, moreover, diligently pursued other alternatives to obtain custody of Demirtas after it concluded that a formal extradition from the Netherlands would be futile. It confirmed that the June 2012 Red Notice remained in place in case Demirtas traveled to another country, and it sought the assistance of Dutch law enforcement in tracking his movements. Aug. 3–4 Tr. at 148–49, 153–54; Dkt. 79-8 at 206. The latter request was refused, Aug. 3–4 Tr. at 153–54, but the former measure ultimately led to Demirtas's arrest in Germany in January 2015 and his subsequent extradition to the United States, Dkt. 79-8 at 228.

33

3.      *Possible Chance to Extradite from France: Jan. 8, 2013 to July 17, 2013*

The Court now turns back to the period of time following Demirtas's French conviction and preceding his return to the Netherlands. As the Court explained above, the government had a good-faith belief, supported by substantial evidence, that extradition of Demirtas from France would have been futile while his French prosecution was pending. The question remains, however, whether the government failed to exercise due diligence in pursuing extradition during the window in time between Demirtas's French conviction on January 8, 2013, Dkt. 78-6, and his return to the Netherlands on July 17, 2013, Dkt. 58-1 at 2.

The parties agree that an extradition request must be made to the country where the person sought is located and that, accordingly, while Demirtas remained in French custody, it was not possible to file an extradition request directly with the Dutch government. Dkt. 79-8 at 34; Aug. 3–4 Tr. at 128, 400–01. It is also undisputed that when the Netherlands surrendered Demirtas to the French for prosecution pursuant to a European Arrest Warrant, it surrendered him on the condition that he could serve any sentence imposed in the Netherlands. Dkt. 78-13 at 4. The order of the Dutch court authorizing Demirtas's surrender to the French government explained that "surrender may only be allowed if the issuing judicial authority provides the guarantee" of return required under Dutch law. *Id.* It also stated that the French government transmitted its "guarantee in accordance with which, if Irfan Demirtas were to be sentenced to a definitive prison sentence for the acts for his extradition . . . , he may serve his sentence in the Netherlands . . . ." *Id.*

According to Demirtas, although France had promised to return him to the Netherlands following any French conviction, the U.S. government had the legal option to pursue his "onward extradition" (also known as a "subextradition") from France to the United States. *See*

Dkt. 58 at 8–9; Dkt. 80-2.  The government responds that France had categorically refused to grant Demirtas's extradition and that, in any event, extradition from France would have been futile for the same reason that it was futile from the Netherlands—Dutch prior jeopardy barred a successive prosecution by the United States.  *See* Aug. 3–4 Tr. at 141.  As explained below, the Court concludes that Demirtas is correct that onward extradition was theoretically available—or at least, that the government has not met its burden to establish legal futility.  *See Fernandes*, 618 F. Supp. 2d at 69.  But, at the same time, the Court finds that the government was not substantially at fault for failing to pursue this possibility, and, in particular, for failing to recognize the unusual urgency of pressing the French government, which had indicated that it could not extradite Demirtas, to reconsider and to seek Dutch consent for onward extradition.

a.      <u>Legal Theory of Demirtas's Extraditability from France</u>

Demirtas argues that the government had a legally viable path to obtain his extradition from France, which it failed to raise with the French.  Under Demirtas's theory, the U.S. government could have obtained custody of him from France at the conclusion of the French prosecution by utilizing several different legal instruments and concepts in tandem: The U.S. government could have obviated timing issues by pursuing a deferred extradition pursuant to the U.S.-French extradition treaty, and it could have overcome the French promise to return Demirtas to the Netherlands by asking the French to seek Dutch consent to an onward extradition and by guaranteeing to the Dutch that Demirtas would serve both his French sentence and any U.S. sentence in the Netherlands.

As explained by Joseph Breham, Demirtas's expert on French extradition law, even assuming that the French were unwilling to interrupt their own prosecution to extradite Demirtas to the United States, under Article 16 of the U.S.-French extradition treaty, France had the option

35

to commence extradition proceedings but to defer the actual extradition of Demirtas to the United States until the conclusion of its prosecution.  Dkt. 80-2 at 6 (Breham Decl.); *see also* Dkt. 85-1 at 24 (text of Article 16).  That is, the government "was not obligated to wait for the end of the prosecution in France to make an official request to France for the extradition of . . . Demirtas."  *Id.*  Making such a request while a prosecution remains underway "allows the requesting state to gain time and [to] obtain custody sooner" than waiting to commence extradition proceedings until the conclusion of the prosecution.  Dkt. 80-2 at 6 (Breham Decl.).  Thus, under Demirtas's theory, the government could have filed a formal extradition request either during the French prosecution or during the six months in which Demirtas remained in France following his French conviction; either way, the request would not have interrupted the French prosecution.

Breham and the defense's expert on Dutch extraditions, Bart Stapert, further explained that the French promise to return Demirtas to the Netherlands to serve any sentence imposed would not have prevented Demirtas's removal to the United States at the conclusion of the French prosecution.  That promise was made pursuant to the *Council Framework Decision of June 13, 2002 on the European Arrest Warrant* ("European Framework") and pursuant to Dutch domestic law.  Dkt. 78-13 at 4; Aug. 3–4 Tr. at 125, 262, 367, 370.  In particular, Article 28(4) of the European Framework provides that "a person who has been surrendered pursuant to a European arrest warrant shall not be extradited to a third State without the consent of the competent authority of the Member State which surrendered the person."  Dkt. 80-3 at 10.  Article 28(4) further explains that "[s]uch consent shall be given in accordance with the Conventions by which that Member State is bound, as well as with its domestic law."  Dkt. 80-3 at 10.  The government, for the most part, does not dispute that deferred extradition and onward

extraditions are, as a general matter, legal options in appropriate circumstances. Instead, it contends that it diligently pursued various alternatives for obtaining custody of Demirtas from the French; that the French were emphatic in their position that they would not extradite Demirtas; and that, in light of this clear response from the French, the U.S. government was not required to file a formal extradition request with France.

According to Stapert, obtaining Dutch consent to an onward extradition from France pursuant to Article 28(4) would have required that the French government make a request for onward extradition to the Dutch Ministry of Security and Justice. Dkt. 73-2 at 2; Aug. 3–4 at Tr. 413. As he explained, the Dutch would then have considered whether onward extradition was consistent with Dutch treaties and domestic law, including prior jeopardy law, Dkt. 73-2 at 2; Aug. 3–4 Tr. at 371, and would have decided whether to exercise their discretion to consent, *see* Aug. 3–4 Tr. at 388, 413; *see also id.* at 401. Finally, Stapert explained that to grant an onward extradition of Demirtas to the United States, France would have to "address the treaty transfer return it had guaranteed to the Dutch" by "negotiat[ing] additional diplomatic assurances or guarantees"—by, for example, obtaining an assurance that Demirtas could return to the Netherlands to serve both the French sentence and any U.S. sentence imposed. Dkt. 73-2 at 2; *see also* Aug. 3–4 Tr. at 371–72.[18]

---

[18]   As explained above, Article 28(4) of the European Framework requires the original surrendering state—here, the Netherlands—to consent to an onward extradition. In his declaration and testimony, Breham also relied on Article 28(2) of the European Framework. *See, e.g.*, Dkt. 80-2 at 13–16. And Article 28(2)—unlike Article 28(4)—provides that the person sought may consent to an onward extradition without the consent of the original surrendering state. *See id.* at 15–16; Dkt. 80-3 at 10. That is, Breham testified that Demirtas himself could have simply consented to an onward extradition, obviating the need for Dutch consent pursuant to Article 28(4) (or Article 28(3), for that matter). Article 28(2), however, is expressly limited to requests for onward extradition made by other Member States of the European Community, whereas Article 28(4) applies to onward extraditions to a non-European "third State." *Compare* Dkt. 80-3 at 10 (addressing surrender to "a Member State other than the executing Member

Stapert further testified that, in his view, Dutch law would not have imposed a prior jeopardy bar to Demirtas's onward extradition while he remained in French custody.[19] According to Stapert, Dutch prior jeopardy law distinguishes between Dutch convictions and foreign convictions. *See* Aug. 3–4 Tr. at 361–62, 375–76. As he explained, in the case of a conviction entered by a Dutch court, jeopardy attaches when final judgment is entered—that is, when the conviction is "irrevocable." *Id.* at 379. In contrast, according to Stapert, jeopardy does not attach with respect to a foreign conviction until service of the sentence imposed is complete. Dkt. 73-2 at 2 (Stapert Decl.); Aug. 3–4 Tr. at 375, 410–11. This distinction finds support in the

State," and "the surrender to another Member State"), *with id.* (addressing "extradi[tion] to a third State"), *and* Aug 3–4 Tr. at 368 (Stapert's testimony that Article 28(4) applies to onward extraditions to non-European Union countries like the United States).

Although Breham testified that France has construed Articles 28(2) as applicable to non-Member States—thereby permitting Demirtas's onward extradition to the United States with his consent alone—the only evidence offered in support of this atextual reading of the European Framework was a French law review article noting that "the overwhelming majority [of] Member States" that have considered the issue require the "advice of authorities of the executing State" and that, although the French courts at one time disagreed, they have modified their position over time. Dkt. 86-3 at 31. Given the testimony of Stapert that Article 28(4) was the controlling provision, Aug. 3–4 Tr. at 414, and given the categorical assertion of Roth's French counterpart that France was bound by its commitment to return Demirtas to the Netherlands, *id.* at 56, the Court concludes that any ambiguity in how the French construed the European Framework carries little weight. The United States certainly did not have a duty to spot the ambiguity in French law and then to push the French—who apparently had not recognized the potential loophole themselves—to extradite Demirtas to the United States without first seeking the consent of the Dutch, who believed that consent was necessary.

And, at any rate, it is undisputed that Dutch domestic law mandated that the French promise that Demirtas, a Dutch national, would be allowed to serve any sentence he might receive in the Netherlands. *See* Aug. 3–4 Tr. at 125, 262, 367, 370. Thus, even assuming that Dutch consent was not a requirement of the European Framework, the active involvement of the Netherlands would have been required for the French to be released from their promise to return Demirtas to the Netherlands at the conclusion of the French prosecution.

[19] Breham, in turn, testified that prior jeopardy would not have barred extradition under French law. *See* Dkt. 80-2 at 7–12. The government has not attempted to rebut that testimony, and thus the Court accepts it for present purposes.

plain (albeit translated) language of the relevant provisions of Dutch law: Article 9(1)(d)(1) of

the Dutch extradition law provides that "extradition of the person claimed will not be permitted

for an offense, in the case of which: . . . (d) he/she has been legally judged to be the person in

cases in which: (1) the *punishment or measure imposed has already been carried out*," as distinct

from cases in which "(4) the judgment comes from the Dutch courts . . . ." Dkt. 78-14 at 10

(emphasis added);[20] Aug. 3–4 Tr. at 374.   And Article 68(2) of the Dutch Criminal Code

---

[20]  A translated version of Article 9 of the Dutch Extradition Law Code provided to the Court in this litigation states:

> 1.  Extradition of the person claimed will not be permitted for an offence, in the case of which:
>
>> a.  at the time of the decision for the request for extradition a criminal investigation in the Netherlands is underway;
>>
>> b.  he/she is being prosecuted but renewed prosecution is excluded under grounds of Section 255, first or second paragraph, or Section 255a, first or second paragraph, of the BES Code of Criminal Procedure;
>>
>> c.  he/she has been denoted as acquitted by the Dutch courts or has been dismissed from prosecution, or can be seen as such if another court has reached a similar decision that is final and conclusive;
>>
>> d.  he/she *has been legally judged* to be the person in cases in which:
>>
>>> 1.  *the punishment or measure imposed has already been carried out,* or
>>>
>>> 2.  that punishment or measure cannot be carried out immediately or cannot possibly be carried out, or
>>>
>>> 3.  the judgment entails a statement of guilt without the imposition of punishment or measure, or
>>>
>>> 4.  *the judgment comes from the Dutch courts* and the authority for extradition is not reserved to the convention for such cases;
>>
>> e.  no prosecution is possible in accordance with Dutch law due to lapse of time, or, if the extradition is requested for the benefit of the implementation of a punishment or measure, punishment can no longer occur.

provides that "[i]f the final judgment was rendered by another court, the same person may not be prosecuted for the same offense in the case of: . . . (2) Conviction, *if punishment is imposed, followed by complete enforcement*, remission or commutation or immunity from punishment by reason of lapse of the period of limitations." Dkt. 71-1 at 5 n.2 (emphasis added);[21] Aug. 3–4 Tr.

---

2. Exclusions may be accepted in that which is set out in the previous Paragraph, opening words and under a, in cases in which Our Minister, in reaching his/her decision, agrees to the request that extradition at the same time as agreeing to the prosecution being stopped.

3. Exclusions may be accepted in that which is set out in the previous paragraph, opening words and under a, in cases in which prosecution has been stopped in the Netherlands, either because the Dutch criminal law on grounds of Sections 2 to 8d or the criminal law of Bonaire, St. Eustatius and Saba on grounds of Sections 2 to 8 of the BES Code of Criminal Procedure do not appear to apply, or because preference was given to a trial abroad.

4. The first paragraph, opening words and under e. is open to exceptions insofar as, in accordance the applicable convention, extradition cannot be rejected exclusively on grounds of the fact that the right to criminal procedures or the right to implementation of that punishment or measure can no longer be carried out under the laws of the requested State due to lapse of time.

Dkt. 78-14 at 10–11 (emphases added); *see also* Dkt. 79-10 (second translation).

[21] The translated version of Article 68 of the Dutch Criminal Code provided to the Court in this litigation states:

l) Except for cases in which judgments are eligible for review, no person may be prosecuted twice for *an offense for which a final judgment has been rendered against him by a court in the Netherlands*, Aruba, Curacao, St. Martin or the public bodies Bonaire, St. Eustatius and Saba.

2) *If the final judgment was rendered by another court*, the same person may not be prosecuted for the same offense in the case of:
  (l) Acquittal or dismissal of the charge(s);
  (2) Conviction, *if punishment is imposed, followed by complete enforcement*, remission or commutation or immunity from punishment by reason of lapse of the period of limitations,

at 375.  Stapert testified that these provisions, as interpreted in "a number of Dutch court cases," mean that "as long as [Demirtas's] sentence [imposed for a foreign conviction] [was] still [on]going, . . . there[] [was] no double jeopardy yet."  Aug. 3–4 Tr. at 375.  And, according to Stapert, that sentence was not fully served until October 8, 2013, when the Dutch resentencing proceeded ended, and thus prior jeopardy would not have posed a bar to extradition until that date.  *See id.* at 411.

The government responds that even assuming the French would have entertained a request for onward extradition—a premise it hotly disputes—prior jeopardy would have precluded extradition after the French court entered final judgment against Demirtas on January 8, 2013, notwithstanding the fact that he had yet to fully serve his sentence.  *See id.* at 116; Dkt. 78-6 (French judgment).  In support of this contention, the government offers the testimony of Friedman, who explained that it was her "experience" and "the conclusion of the Ministry of Security and Justice" that jeopardy attaches as soon as a conviction becomes final.  Aug. 3–4 Tr. at 116.  She testified that, "rather than . . . trying to figure out the nuances of a translated version of a statute from the Netherlands," she relied "on many years plus conversations and exchanges with" her Dutch counterpart, *id.* at 117–18, and that "from what [she] underst[oo]d from [her] counterpart," the Dutch concept of "complete enforcement" goes to the finality of the judicial process, including sentencing, but does not require that *service* of the sentence be completed, *id.* at 118.

---

3) A person may not be prosecuted for an offense that has been finally settled in his case in a foreign country through his fulfilment of a condition set by the competent authorities in order to avoid criminal prosecution.

Dkt. 71-1 at 5 (emphases added).

Friedman repeatedly based her understanding of when prior jeopardy attached on the fact that the term "'irrevocable' under Dutch law means that there are no more legal remedies [or] appeals" and "has nothing to do with the sentence being served." *Id.* at 272, 276–77; *see also id.* at 115. There is no dispute that "irrevocable" means "final judgment" for purposes of Dutch law. An "irrevocable" judgment is a judgment from which no further appeals are allowed. Both Stapert and Friedman's Dutch counterpart confirmed as much. Dkt. 78-14 at 21; Aug. 3–4 Tr. at 379. Friedman's explanation of when jeopardy attached to the French conviction falters, however, because "irrevocable" or "final judgment" is not the relevant limiting language in the clauses of Articles 9 and 68 applicable to foreign convictions. Although an "irrevocable" or "final judgment" is a prerequisite to the attachment of prior jeopardy, Articles 9(1)(d)(1) and 68(2)(2) establish further conditions for jeopardy to attach to *foreign* convictions, requiring, respectively, that the "punishment or measure imposed has already been carried out" and that there has been "complete enforcement" of the punishment. *Supra* notes 20, 21. Friedman's recitation of Dutch law thus misses the distinction, elucidated by Stapert, regarding when jeopardy attaches to a domestic conviction versus a foreign one. And, although Friedman testified that her Dutch counterpart confirmed her understanding of when jeopardy attaches to a foreign conviction, she in fact merely asked her counterpart to confirm her understanding of "irrevocable," which, as explained above, was indisputably correct. Aug. 3–4 Tr. at 272, 276–77; Dkt. 78-14 at 21–23.[22]

---

[22] More precisely, Friedman asked for her counterpart's thoughts on the declaration filed by Stapert in this case. Friedman stated, "[Stapert] says that 'irrevocable' under Dutch law means that the sentence has been served or completed (I don't think that's true)." Dkt. 78-14 at 23. Her counterpart then replied, "Irrevocable means that there are no more legal remedies (appeals). It has nothing to do with the sentence being served." *Id.* at 22. But Stapert never used the word "irrevocable" in his declaration, and Friedman had not sent her Dutch counterpart a copy of Stapert's declaration. Dkt. 73-2; Aug. 3–4 Tr. at 271. Thus, the best reading of this exchange is

Stapert, in contrast to Friedman, premised his testimony on the plain language of Article 68 of the Dutch Criminal Code, which expressly distinguishes between "a final judgment" entered "by a court in the Netherlands" and a "final judgment" "rendered by another court." Dkt. 71-1 at 5. Stapert conceded that this is "an odd difference," Aug. 3–4 Tr. at 376, but he offered a plausible explanation for the difference in treatment of Dutch and foreign convictions. The distinction, according to Stapert, was created so that defendants convicted in other countries could not then flee to the Netherlands and escape both service of the foreign sentence and re-institution of the prosecution by Dutch authorities. *Id.* at 377. Stapert further explained that, although the distinction between foreign and domestic convictions was adopted in an era before instruments of international judicial cooperation facilitated the ability of a country to execute a sentence imposed by another, the rule that prior jeopardy attaches to a foreign conviction on completion of the sentence remains "valid law." *Id.* at 376–77. The Court found Stapert—who, in the course of his nearly thirty-year legal career, has worked on Dutch extradition matters in private practice and as a contractor for the Dutch government, taught international law, and served as a Dutch judge in a criminal appellate court, Aug. 3–4 Tr. at 358–59, 363–64—to be a highly credible expert witness. The Court accepts his explanation of the applicable Dutch-law principles.

---

that Friedman's counterpart merely confirmed that which is undisputed—that "irrevocable" means a "final judgment." Indeed, when Friedman asked her Dutch counterpart if the Dutch Ministry of Security and Justice "would have come to the same conclusion, i.e. [prior] jeopardy" had France asked for its consent to an onward extradition, the counterpart replied that he "c[ould]n't say what [the Ministry's] decision [would] h[ave] been, had the French been willing to extradite Demirtas to the [United States] and had they asked for permission." Dkt. 78-14 at 21–23. The counterpart did not identify prior jeopardy as an obstacle had Dutch consent to an onward extradition been sought. *Id.*

In light of the foregoing, the Court cannot conclude that a request that the French institute a deferred extradition proceeding with a view toward the onward extradition of Demirtas before he was returned to the Netherlands would, as a legal matter, have been futile.

b.     The Government's Diligence

At the same time, however, the Court is convinced that the government acted with reasonable diligence. That is, although the Court concludes that the defense correctly states the controlling law, it also concludes that the government's views were held in good faith and that its failure to pursue onward extradition of Demirtas from France was not unreasonable under the circumstances.

In support of its contention that a request for onward extradition from France would not have succeeded, the government points to the email that Roth received from her French counterpart, which asserted that because France was "committed to the Netherlands to return" Demirtas, "it [could not] give him to a different country . . . as part of . . . an extradition request." Dkt. 58-8 at 2. According to Roth's contemporaneous notes, moreover, her French counterpart relayed a similar message in a conversation earlier that same day, telling her that the French "agreement . . . to return [Demirtas] to the Netherlands to serve any sentence imposed" by the French meant "that if Demirtas [were] convicted [in France], he [would be] shipped immediately to the Netherlands to serve the sentence there" and that, "[f]or that reason, France cannot authorize/approve his extradition to the [United] States." Dkt. 79-8 at 7–8. And, as Roth explained in an email to Friedman, "France will not entertain an extradition request from us (they can't grant extradition while he's pending trial, and they won't have the body upon conviction)." Dkt. 78-9 at 1.

At least as Roth understood these communications, the French were unequivocal in their refusal to extradite Demirtas from France. But, as explained above, the desire of the French to complete their own proceedings without interruption and their commitment to return Demirtas to the Netherlands did not necessarily foreclose the possibility of a deferred extradition proceeding, which, if successful, would have led to Demirtas's onward extradition from France at the completion of the French prosecution. And although Roth did raise various alternatives with the French, neither she nor any other U.S. official ever suggested this approach to the French. It appears that the government did not do so for a combination of reasons.

As an initial matter, Roth testified that "the French would have [had] no ability to . . . ask the Dutch [to consent to an onward extradition], because they'd already agreed to turn him over" to the Dutch at the conclusion of the French proceedings. Aug. 3–4 Tr. at 128, 131. That, however, is not entirely correct, because France could have sought Dutch consent to onward extradition under Article 28(4) of the European Framework. Although it is unclear whether the French would have agreed to do so or how the Dutch would have responded to such a request, *see* Dkt. 78-14 at 21, this was a legal option that the government could have raised with the French.

Although Roth and Friedman were unfamiliar with the specific European Warrant provisions under which Demirtas posits that his onward extradition could have been obtained, Aug. 3–4 Tr. at 69–70, 76–77, 91, 260, they were generally aware of the concept of onward extraditions. Roth testified that she was aware that under Article 20 of the U.S.-French extradition treaty, there is an exception to the rule that "[w]hen a person has been surrendered by the Requested State to the Requesting State, the Requesting State shall not surrender the person extradited to a third state" in cases in which the "Requested State consents to such surrender."

*Id*. at 68–69.[23]  Roth further testified that it is "common" for extradition treaties to include such provisions permitting onward extraditions with the consent of the original requested state.  *Id*. at 68–69.  And Friedman testified that she was aware of Article 15 of the U.S.-Dutch extradition treaty, which contains a parallel provision.  *Id*. at 254.[24]  Indeed, in a September 2012 email to

---

[23]  Article 20 provides:

Reextradition to a Third State

1.  When a person has been surrendered by the Requested State to the Requesting State, the Requesting State shall not surrender the person extradited to a third State for an offense prior to the person's surrender, unless:

(a) the Requested State consents to such surrender; or

(b) the person extradited, having had the opportunity to do so, did not leave the territory of the Requesting State within 30 days of the person's final release, or returned to the territory of the Requesting State after having left it.

2.  Before granting a request under paragraph 1(a) above, the Requested State may request the documents referred to in Article 10, and any statements made by the person extradited with respect to the offense for which the consent of the Requested State is requested.

Dkt. 85-1 at 28 (*Extradition Treaty Between the United States of America and France*, art. 20, Apr. 23, 1996).

[24]  As relevant here, Article 15 provides:

1.  A person extradited under this Treaty shall not be detained, tried or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted, nor be extradited by that State to a third State, unless: . . . c. The Executive Authority of the Requested State has consented to detention, trial, or punishment of that person for an offense other than that for which extradition was granted, or to extradition to a third State. For this purpose, the Requested State may require the submission of any document or statement mentioned in Article 9, including any statement made by the extradited person with respect to the offense concerned.

Dkt. 78-12 at 14 (*Agreement Comprising the Instrument as Contemplated By Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union as to the Application of the Extradition Treaty Between the United States of America and the Kingdom of the Netherlands Signed at The Hague on 24 June 1980*, art. 5, Sept. 29, 2004).

Roth and DiLorenzo, Friedman mentioned in passing that the Dutch would have to approve the extradition of Demirtas "even if [the government] sent the request to the French." Dkt. 79-8 at 24.

Given the fact that Roth and Friedman had some familiarity with the concept of onward extradition, it is likely that their failure to pursue that option was based on Roth's belief that Demirtas would be "shipped immediately to the Netherlands to serve the sentence there," *id.* at 8, leaving no window for—or reason to pursue—an extradition in France. That is, in light of France's statement that it would not extradite Demirtas during the course of the French prosecution, Roth's assessment at the time was that the only plausible option was to wait until the French proceedings were completed and Demirtas was returned to the Netherlands, at which point the U.S. government could initiate Dutch extradition proceedings. *Cf. id.* at 34–35 (Friedman's email to DiLorenzo in September 2012, stating that "[r]equests can only go to where the body is," and DiLorenzo's request for clarification as to whether he had to wait, which apparently went unanswered).

That assessment, however, failed to take into account a number of relevant considerations. First, it appears that Roth and Friedman did not recognize or failed to focus on the prospect that *deferred* surrender—as distinct from a temporary surrender during the course of a prosecution—was an option. Aug. 3–4 Tr. at 36–7, 87, 91, 312. That is, they apparently gave no consideration to the deferred surrender option in Article 16 of the U.S.-French extradition treaty, which allows France to grant a request for extradition during its prosecution while deferring actual removal of the defendant until the conclusion of the French case. Dkt. 80-2 at 6; *see* Dkt. 85-1 at 24 (text of Article 16). Second, the government also mistakenly believed— apparently based on the statements of Roth's French counterpart and a lack of its own experience

with application of the European Framework—that the transfer of custody to the Netherlands would happen immediately following the French conviction. *See* Dkt. 79-8 at 8, 11; *see also* Aug. 3–4 Tr. at 132, 260. And, third, Roth and Friedman failed to anticipate the gravity of failing to seek an onward extradition from France. That is, they failed to appreciate that once Demirtas returned to the Netherlands, it would be too late to seek his extradition because Dutch law barred extradition while the Dutch re-sentencing proceedings were underway and, once those proceedings were completed, Dutch prior jeopardy would come into play. *See supra* part III.B.2.

Putting aside the issue of prior jeopardy, it was not unreasonable for the government to conclude that it should wait until Demirtas was returned to the Netherlands to seek extradition. France had declined the government's request for a provisional arrest and had repeatedly informed Roth that it could not grant an extradition request in light of its guarantee to return Demirtas to the Netherlands. Dkt. 58-8 at 2; Dkt. 79-8 at 7–8. Although Roth might have more effectively pushed back on this conclusion by raising the prospect of deferred extradition and the possibility that the French might agree to seek Dutch consent, any significant advantage to doing so was far from apparent at the time, and it is far from clear that "that any such effort would have succeeded." *Tchibassa*, 452 F.3d at 925. To do so would have, in effect, required that the government clear two sets of hurdles to extradition: those arising under the U.S.-French extradition treaty and French law, and those arising under the U.S.-Dutch extradition treaty and Dutch law. And, as Stapert acknowledged, Dutch officials would have retained discretion to deny consent to an onward extradition. *See* Aug. 3–4 Tr. at 388, 413; *see also id.* at 401. In the ordinary course, there is little doubt that it would have been reasonable for the government to wait to seek extradition until Demirtas was returned to the Netherlands.

48

Here, however, one factor counseled in favor of pressing harder for Demirtas's extradition while he remained in France: As the Court explained above, once Demirtas returned to the Netherlands, his extradition became futile. *See supra* pp. 24–33. But, while it is tempting to read the record with the benefit of hindsight and with the benefit of expert testimony, the requirement that the government use "reasonable diligence" in pursuing a defendant located overseas does not mean that the government's efforts must be flawless. *Doggett*, 505 U.S. at 656. Friedman's failure to anticipate the nuances of Dutch prior jeopardy law—that is, that there was a brief window in time when jeopardy did not preclude Dutch approval of Demirtas's extradition—was not unreasonable. Friedman had handled "all legal assistance and extradition requests to and from the Netherlands" for over twenty years, Dkt. 71-1 at 2 (Friedman Decl. ¶ 3), yet was unaware of the peculiar distinction in Dutch law between when jeopardy attaches for foreign and domestic convictions. Notably, when Friedman and her knowledgeable Dutch counterpart engaged in discussions of prior jeopardy law upon Demirtas's return to the Netherlands, the Dutch counterpart never suggested that the United States might have missed its window by having waited until Demirtas was returned to the Netherlands, even though Demirtas's sentence was not fully served for almost three months after Demirtas's return. Dkt. 67-1 at 44. And even Stapert conceded that the distinction between Dutch and foreign convictions was an "odd" one grounded in an outmoded rationale. Aug. 3–4 Tr. at 22.

Overall, the record reflects that U.S. officials actively and in good faith sought to obtain custody of Demirtas at the earliest reasonable time, but that, with the benefit of hindsight, it would have been preferable to have at least further explored with the French whether they would have been willing to institute a deferred extradition proceeding and to seek Dutch consent to an onward extradition prior to Demirtas's return to the Netherlands. The Court, accordingly,

concludes that the government is "more to blame" than Demirtas—who bears no blame at all—for the failure to obtain his extradition from France. *Doggett*, 505 U.S. at 651. But, on the spectrum ranging from "deliberate" delay to "valid reason[s]" for delay, *Barker*, 407 U.S. at 531, the government's conduct is best viewed as an understandable failure to raise an alternative legal strategy with the French officials in a complex case involving a multi-country extradition process and an arcane issue of Dutch prior jeopardy law, *cf. Bagga*, 782 F.2d at 1544 (finding that the government's conduct was "clearly no more than mere negligence" and insufficient to "tip the scale in favor of the defendant"); *see also United States v. Kresler*, 392 F. App'x 765, 771 (11th Cir. 2010) (quoting *Bagga*, 782 F.2d at 1544).

Finally, although the government took no actions to seek custody of Demirtas during the six-month period following his conviction in France and preceding his return to the Netherlands, *see* Aug. 3–4 Tr. at 89, 296, the Court does not fault the government for this period of inactivity, except to the extent that, as explained above, it failed *earlier* to recognize that this was a key moment when an extradition might possibly have been carried out. The government's pursuit of Demirtas lay dormant between January 25, 2013—when it learned that the French prosecution had concluded, Dkt. 67-2 at 7—and July 17, 2013—when it learned that Demirtas had been released in the Netherlands, Dkt. 71-1 at 7 (Friedman Decl. ¶ 10). But, the government reasonably believed that it would receive notice prior to Demirtas's release from foreign custody. *See Valencia-Quintana*, 136 F. App'x at 709–10. Roth's French counterpart had told her that there would be "a [ten-]day delay before release from the date of any court decision that would result in [Demirtas's] freedom," and that the U.S. government would accordingly have time to serve a provisional arrest request prior to Demirtas's release. Dkt. 79-8 at 8; *see also* Aug. 3–4

Tr. at 41–42, 90–91.  The government is not at fault where, as here, foreign authorities "fail[ed] to provide the promised notice." *Valencia-Quintana*, 136 F. App'x at 709–10.[25]

4.   *German Arrest to Initial Appearance: Jan. 12, 2015 to July 20, 2015*

This, then, leaves the period of time between Demirtas's arrest in Germany on January 12, 2015, Dkt. 24 at 4; Dkt. 79-8 at 228, and his initial appearance before this Court on July 20, 2015.  The Court concludes that the government is not to blame for this approximately six-month delay in bringing Demirtas to trial.

The government proceeded with due diligence in seeking Demirtas's extradition from Germany.  Just two days after Demirtas was arrested in the Dusseldorf airport pursuant to the Red Notice, the government submitted a request for his provisional arrest and informed German officials that it intended to file a formal request for extradition.  Dkt. 79-8 at 228; Dkt. 78-8 at 250–51; Aug. 3–4 Tr. at 172.  The formal extradition packet was then delivered to the German Foreign Office on March 11, 2015, within the time permitted under the U.S.-German extradition treaty.  Dkt. 78-8 at 160; Aug. 3–4 Tr. at 172, 175.[26]  Although Demirtas suggests that the government could have prepared and submitted the extradition package with greater haste, reasonable diligence did not require it to submit the formal request in advance of the legal deadline.

---

[25]   The government was also surprised to learn that its Red Notice had failed to prevent Demirtas's release, filing a "formal inquiry with Interpol on why France and the Netherlands missed or ignored the Red Notice."  Dkt. 78-8 at 49.  Roth testified, however, that the French will hold a defendant on a Red Notice for only four hours, even though they will honor a request for a provisional arrest by holding a defendant in detention for sixty days pending the submission of formal extradition documents.  Aug. 3–4 Tr. at 90.

[26]   The United States requested and received a twenty-day extension to submit the formal extradition package, as permitted under the terms of the treaty.  The OIA official responsible for extraditions involving Germany testified that it was "typical[]" for both sides to seek this extension.  Aug. 3–4 Tr. at 172.

Nor did the government cause any unjustified delay of Demirtas's removal to the United States once Germany granted extradition. The German court of first review approved Demirtas's extradition in early June 2015, and the last of Demirtas's three appeals was denied on or about July 2, 2015, clearing the way for Demirtas's removal to the United States. *See* Aug. 3–4 Tr. at 177–78, 188–89; Dkt. 78-8 at 104–05. Six days later, the German prosecutor general's office accepted the government's proposed travel itinerary, which listed a departure date of July 15, 2015. Dkt. 78-8 at 101. There was then a two-day postponement of the itinerary because the plane to be used for Demirtas's transport was "unexpectedly down for maintenance," Dkt. 78-8 at 99—a valid reason for this brief delay. The OIA official responsible for coordinating the logistics of extraditions from Germany testified that, overall, Demirtas's extradition was "really on the short end [of the range of times it takes to] organiz[e] these removals." Aug. 3–4 Tr. at 193–94. The Court concludes that Demirtas's pending appeals and the need to finalize arrangements for his transportation to the United States provide ample justification for the short delay between the German court's initial approval of extradition and Demirtas's actual removal to the United States. *See Loud Hawk*, 474 U.S. at 316.

The evidence thus shows that the approximately six-month delay between Demirtas's arrest in Germany and his initial appearance before this Court was within "the typical timeframe for contested extraditions" from Germany, Aug. 3–4 Tr. at 179, and that the government exercised reasonable diligence in pursuing Demirtas during this period.

* * *

In sum, the Court concludes that the government had a good-faith belief, supported by substantial evidence, that Demirtas's extradition from France would have been futile while his French prosecution remained underway and that his extradition from the Netherlands would have

been futile due to pending proceedings and to prior jeopardy. The Court also finds that, although the government might have done more to push for extradition of Demirtas within the six-month window between his French conviction and his return to the Netherlands, its failure to recognize the importance of seeking a deferred, onward extradition from France is understandable in light of the complex mix of international and foreign legal rules at issue. Any misstep during this period of time did not constitute a lack of reasonable diligence in pursuing Demirtas's arrest.

## C.    Defendant's Assertion of Speedy Trial Right

The third *Barker* factor—the defendant's assertion of the speedy trial right—is often intertwined with the second factor—who is "more to blame for the delay." *Doggett*, 505 U.S. at 651. If a defendant is aware of the charges and becomes a fugitive, concealing his whereabouts from the government, he is generally charged with fault for the delay, as well as with failure to assert his right to a speedy trial. *See Fernandes*, 618 F. Supp. 2d at 70, 72. In contrast, a defendant cannot be blamed for a failure to assert his right to a speedy trial until he "know[s] of the charges" against him. *Doggett*, 505 U.S. at 653–54.

The government makes three arguments that Demirtas failed timely to assert his speedy trial right such that the third factor weighs against him. First, it contends that Demirtas "was clearly aware that the United States was looking at him for engaging in terrorist-related activity" as early as September 24, 2009, when the FBI and DiLorenzo interviewed him while he was in French custody. Dkt. 44 at 20. According to the government, notwithstanding this purported knowledge, Demirtas failed to assert his right to a speedy trial until 2015. *Id.*

This argument is without merit. During the 2009 interview, DiLorenzo informed Demirtas that he had not been charged with a crime in the United States and that DiLorenzo could not say whether Demirtas was a suspect. Dkt. 58-7 at 2. Indeed, the grand jury did not

return the indictment against Demirtas for well over two years after the Paris interview, and the indictment remained under seal until 2015. Dkt. 3; July 20, 2015 Min. Order. There is no evidence that Demirtas was aware of pending U.S. charges against him prior to his arrest in Germany on January 12, 2015. *Cf. Tchibassa*, 452 F.3d at 926 (holding defendant responsible for failing to assert speedy trial right because "he was aware that charges were pending against him"). Demirtas thus cannot be faulted for failing to assert his speedy trial right before that time. *See Doggett*, 505 U.S. at 653–54.

Second, the government emphasizes that Demirtas contested his extradition from Germany, instead of seeking to be brought promptly to the United States to face the charges. Dkt. 44 at 20. On this record, there is no sound basis for a finding that Demirtas wasted time "by filing indisputably frivolous" appeals,[27] *Loud Hawk*, 474 U.S. at 314, and there is no basis to conclude that Demirtas's efforts to fight extradition in early 2015 means that any *prior* delay by the government in pursuing him was thereby vitiated. Rather, the delay occasioned by Demirtas's 2015 challenge to his extradition from Germany should simply be "excluded from [the] calculation" of overall delay in bringing Demirtas to trial in the United States. *Heshelman*, 521 F. App'x at 505 n.3; *see also United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995) ("Manning cannot avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain about the delay that he has caused by refusing to return voluntarily to the United States."). The government continues to bear the burden, however, of

---

[27] In an email included in the record, the OIA official responsible for extraditions from Germany recounts that an official with the German Federal Office of Justice told him that one of the issues raised by Demirtas in one of the three rounds of appeals "appear[ed] . . . to be completely meritless." Dkt. 78-8 at 107. However, the same OIA official testified that he was otherwise unaware of what issues Demirtas raised during the various appeals. Aug. 3–4 Tr. at 177, 194.

justifying the delay between Demirtas's indictment on December 8, 2011 and his arrest in Germany on January 12, 2015.

Third, the government faults Demirtas for failing to assert his right to a speedy trial until September 9, 2015—"nearly nine months after his arrest." Dkt. 44 at 20. But the government misapprehends the facts. Demirtas requested a speedy trial at his initial appearance before this Court on July 20, 2015. Dkt. 35 at 7–8. At the subsequent detention hearing held on July 23, 2015, prior defense counsel agreed to waive time under the Speedy Trial Act ("STA") until the next hearing on September 9, 2015, stating that the "government is going to use this time to produce discovery and inform us more about the case." Dkt. 35 at 8. From September 9, 2015, onward, Demirtas repeatedly and consistently objected to any delay and refused to waive time under the STA. Dkt. 37 at 11; Dkt. 38 at 20; Dkt. 39 at 23; Dkt. 40 at 12; Dkt. 41 at 12–13.

The Court finds that Demirtas's single waiver of time under the STA—from July 23, 2009 to September 9, 2015—is immaterial to his constitutional speedy trial claim. Rather, the Court is required to "weigh the frequency and force of the objections" to delay. *Barker*, 407 U.S. at 529; *see also id.* at 528 (rejecting "demand-waiver" approach under which "fail[ure] to demand a speedy trial forever waives [the] right"). Here, Demirtas requested a speedy trial at his first appearance before this Court, and, with only one exception, reasserted that right at every opportunity. The Court, moreover, "attach[es] a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces." *Id.* at 529. Demirtas consented to the brief STA waiver on advice of counsel, presumably without personal knowledge of the U.S. legal system, and for the limited purposes of allowing the government to complete discovery and enabling defense counsel to review that discovery. *See* Dkt. 24 at 8; *see also Barker*, 407 U.S. at 527–28 (recognizing that tension often arises when

defense counsel needs time to prepare, notwithstanding the defendant's request for a speedy trial). The Court, accordingly, declines to fault Demirtas for his limited waiver of time under the STA.

## D.      Prejudice

Under the fourth *Barker* factor—prejudice—the Court considers three kinds of prejudice that result from "unreasonable delay between formal accusation and trial": "'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654 (alteration in original) (quoting *Barker*, 407 U.S. at 532). The former two forms of prejudice are largely irrelevant in this case, as there is no evidence that Demirtas was aware of the charges (and therefore anxious or concerned about them) prior to his arrest in Germany, and the time he spent incarcerated prior to his arrest in Germany was attributable to the French prosecution, rather than to the U.S. charges. *See Tchibassa*, 452 F.3d at 926–27.

"Of the[] forms of prejudice," however, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532). Here, the forty-three month interval between Demirtas's indictment and his appearance before this Court is well beyond the amount of time ordinarily deemed "presumptively prejudicial." *Id*. at 651, 652 n.1 ("[C]ourts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."). Indeed, even if limited to the period of time running from the completion of the French proceedings—prior to which there was no colorable means of obtaining custody of Demirtas—to Demirtas's arrest in Germany, the two-year delay exceeds the period of time that is presumptively prejudicial. Demirtas contends that this delay has prevented him from

interviewing witnesses who were incarcerated with him in France, and who have since been released and cannot be located. Dkt. 24 at 9; June Tr. at 66–68 (defense counsel's representation that to date, her investigator, who is located abroad, has been unable to track down current addresses for the potential witnesses). The parties dispute, however, whether these prospective witnesses' testimony would be inculpatory or exculpatory. Dkt. 44 at 21–22; June Tr. at 67–68.

Given the dearth of evidence regarding any lost witnesses and the content of their would-be testimony, Demirtas has not made a showing of "particularized" or "specific" prejudice.[28] *Doggett*, 505 U.S. at 655–56; *see also Tchibassa*, 452 F.3d at 927. But neither has the government "persuasively rebutted" the presumption of prejudice. *Doggett*, 505 U.S. at 658. That presumption rests on the understanding that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* at 655 (quoting *Barker*, 407 U.S. at 532). Here, the passage of time in bringing Demirtas to the United States to stand trial "presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.*; *see also Barker*, 407 U.S. at 532. Thus, in balancing the *Barker* factors, the presumptive prejudice to Demirtas from delay remains "part of the mix of relevant facts." *Doggett*, 505 U.S. at 656.

---

[28] Demirtas points out that the French have an inquisitorial, rather than an adversarial, criminal justice system, meaning that the investigation is conducted by the magistrate and not the defense lawyers. Thus, Demirtas's French lawyers would not have engaged in the kind of investigation that U.S. defense lawyers employ. *See* Dkt. 24 at 9. The Court recognizes this difference between the U.S. and French systems but lacks specific evidence regarding the scope of the French investigation, whether the magistrate's files are available, and, if they are, whether they would reveal some or all of the information Demirtas seeks.

**E.**     **Balancing**

Finally, the Court must balance the four factors. As for the first factor—the length of the delay—the forty-three-month delay between Demirtas's indictment and his initial appearance before this Court weighs somewhat in favor of dismissal. The delay was more than three times as long as the threshold one-year delay that triggers a *Barker* analysis, and "courts have dismissed cases on speedy trial grounds based on delays of [shorter] length." *Fernandes*, 618 F. Supp. 2d at 68, 74 (twenty-three month delay). This delay must, however, be examined in the context of the second *Barker* factor, which requires consideration of which portions of the delay, if any, are attributable to the government.

The second factor—"[t]he flag all litigants seek to capture," *Loud Hawk*, 474 U.S. at 315—"assesses whether the government or the defendant is more to blame for the delay." *Fernandes*, 618 F. Supp. 2d at 74. Here, because Demirtas was unaware of the U.S. charges pending against him prior to his arrest in Germany, he cannot be blamed for that delay. As for whether the government is to blame, as explained above, the government has established that it had a good-faith belief, supported by substantial evidence, that a formal request to extradite Demirtas would have been futile during the French prosecution, as well as once Demirtas was returned to the Netherlands—accounting for thirty-one months of the challenged delay. And, although Demirtas's extradition from Germany after he was arrested there in 2015 took six months to carry out, the government unquestionably proceeded with due diligence during this period.

Complicating the matter is the fact that the government has not "provided substantial evidence that extradition would have been futile" for the entirety of the time preceding Demirtas's arrest in Germany. *Fernandes*, 618 F. Supp. 2d at 74. Demirtas has propounded a

plausible theory of how his removal to the United States for prosecution might conceivably have been achieved during the six-month window between the conclusion of the French case on January 8, 2013, and his transfer to the Netherlands on July 17, 2013. The government could have raised this possibility with the French and pressed harder for extradition during this time. But, the Court also concludes that the government did not act unreasonably when it failed to recognize that a combination of treaty provisions and foreign laws, if wielded in combination with the cooperation of two foreign governments, might have provided a path forward, and instead accepted a French official's categorical statements that extradition from France would not be granted. It is only with the benefit of hindsight and a nuanced understanding of an oddity of Dutch prior jeopardy law that it becomes evident that this was the critical moment to press for Demirtas's extradition. This is thus an unusual case in which the government is arguably responsible, but not substantially culpable, for the delay in bringing Demirtas to trial, because his U.S. prosecution might conceivably have started as early as late January 2013. At most, the government is responsible for this approximately two-and-a-half year difference in when Demirtas's U.S. proceedings might have commenced but for the government's failure to seek extradition from France. The process that Demirtas suggests that the government might have pursued was by no means a sure thing, but it was a path that the government might have at least presented to the French had it put all of the (admittedly complex) pieces together at the relevant time.

The third factor, the defendant's assertion of his right to a speedy trial, generally "repeats the analysis of defendant's role in causing the delay." *Fernandes*, 618 F. Supp. 2d at 74. Here, there is no evidence that Demirtas was aware of the charges against him until he was arrested in Germany, and thus he cannot be blamed for failing to assert his right to a speedy trial before that

time.  This is accordingly an unusual case in a second respect: Unlike in most of the cases cited

by the government, Demirtas did not knowingly become a fugitive from justice.  *Cf., e.g.,*

*Tchibassa*, 452 F.3d at 926; *Wangrow*, 924 F.2d at 1437; *Blanco*, 861 F.2d at 779.  And although

Demirtas contested his extradition from Germany and was thus, in a sense, "a reluctant

defendant," *Bagga*, 782 F.2d at 1545, the Court declines to hold against him his assertion of his

rights of appeal, absent evidence that his appeals were frivolous, *cf. Loud Hawk*, 474 U.S. at

314–15.  Rather, it merely holds that the delay occasioned by Demirtas's efforts to fight

extradition do not count against the speedy trial clock.

Finally, with respect to the fourth factor—prejudice—Demirtas has not established that

he suffered "particularized" or "specific" prejudice.  *Doggett*, 505 U.S. at 655–56.  But because

"the government is more to blame" than Demirtas for not bringing him to trial approximately

two-and-a-half years earlier than it did, Demirtas "is entitled to a presumption of prejudice,

which the government has not rebutted."  *Fernandes,* 618 F. Supp. 2d at 74.

On balance, the Court finds that the government did not *unreasonably* delay Demirtas's

prosecution and that he is not entitled to dismissal of the indictment based on a violation of his

Sixth Amendment right to a speedy trial.  This case is a difficult one, which cannot be answered

with a simple (or not so simple) assessment of which party is right about the meaning of the

relevant treaties, conventions, and foreign law.  The Supreme Court has admonished, moreover,

that "none of the four [*Barker*] factors . . . [is] either a necessary or sufficient condition to the

finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be

considered together with such other circumstances as may be relevant."  *Barker*, 407 U.S. at 533.

That is, "[t]he *Barker* test" is not intended to provide "an easy, mechanical answer," requiring

instead "a difficult and sensitive balancing process."  *Jones*, 524 F.2d at 846; *see also Barker*,

407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis.").

Here, had the government fully anticipated and understood the problems of foreign law involved in obtaining custody of Demirtas, it *might* have been able to bring him to trial sooner. This is not a case, however, in which the government simply failed to take an "obvious step to secure" custody of the defendant. *Fernandes*, 618 F. Supp. 2d at 74. Nor is it a case in which the government failed to devote its attention and resources to pursuing the defendant. To the contrary, the government promulgated an Interpol diffusion and Red Notice, it conferred repeatedly with its French and Dutch counterparts, and it reasonably understood informal communications from the responsible French and Dutch officials to mean that extradition was not possible. In light of the Court's conclusion that the government proceeded with reasonable diligence in pursuing Demirtas—albeit not with perfection—and in light of the facts that Demirtas has not established specific prejudice and was not detained by the United States at the relevant times, the Court will deny the motion to dismiss. *See Doggett*, 505 U.S. at 656 ("[I]f the Government . . . pursued [the defendant] with reasonable diligence . . . , his speedy trial claim would fail . . . as a matter of course however great the delay, so long as [he] could not show specific prejudice to his defense."); *Bagga*, 782 F.2d at 1544 ("[A] more neutral reason" for the delay "does not necessarily tip the scale in favor of the defendant, particularly where the defendant was at liberty and outside the jurisdiction where the indictment was returned.").

## CONCLUSION

In light of the foregoing, Demirtas's motion to dismiss, Dkt. 24, is hereby **DENIED.**

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 2, 2016