**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA :**

**v. : 11-cr-0356 (RDM)**

**IRFAN DEMIRTAS :**

# DEFENDANT'S SENTENCING MEMORANDUM

On September 15, 2016, Irfan Demirtas entered a guilty plea to one count of providing, attempting to provide and conspiring to provide material support or resources to a designated terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2. He will appear before this Honorable Court for sentencing on November 30, 2016. Mr. Demirtas respectfully requests that the Court recognize all of the time that he has served in relation to the charged acts, including the 62 months from the date of his arrest in the Netherlands on May 16, 2008, through the time he served in France, until the date of his release in the Netherlands on July 17, 2013,[1] and including the more than 22 months from the date of his arrest in Germany on January 12, 2015, through the date of his sentencing. With good-time credits included,[2] the 84 and a half months he has served for these acts is the equivalent of a 97-month sentence. For the reasons set forth below, a sentence of no more than the time he has served is appropriate based on the factors set forth in 18 U.S.C. § 3553(a).

[1] The Plea Agreement [Dkt. #89] incorrectly states that the date of his release in the Netherlands was June 17, 2013. *Id.* at 6. As the evidence previously presented to the Court demonstrates, he was released on July 17, 2013. *See* Memorandum Opinion and Order [Dkt. #87] at 8.

[2] Pursuant to 18 U.S.C. § 3624(b)(1), federal prisoners are awarded 54 days per year in good-time credits.

## Factual Background

Mr. Demirtas was born in Turkey in 1959, and lived with his parents and siblings in Ankara. When he was approximately six years old, his father moved to Belgium, and later to the Netherlands, to obtain work. His father continued to support the family financially, but in his absence, Mr. Demirtas was a father-figure to his younger brother and sister. From a young age, Mr. Demirtas worked hard to help support his family both financially and emotionally.

When he was in elementary school, he sold bagels before school and polished shoes after school to make money for his family. He remembers a teacher visiting his home after he finished elementary school and telling his mother that he was a good student and should stay in school. Unfortunately, his family needed income, and instead of continuing his education, at the age of 12, he began working long hours in a car repair shop. Over the following years, he worked in several different garages and became a skilled mechanic.

When he was 18 years old, Mr. Demirtas moved to Tilburg in the Netherlands, to live with his father. He obtained a job at a tea factory, where he worked for several months, while taking language courses at night to learn Dutch. He later got a job in a pipe factory, where he worked for a short time before finding employment as an auto mechanic. In 1980, he began working at a glass factory, where his father and uncle were employed, and he worked there for several years.

In 1982, when he was 22 years old, Mr. Demirtas married his first wife, Semra. They had three sons, Muhammet, Recep, and Erkan, who are now 26, 33, and 34 years old, respectively. For many years, their sons were the focus of their lives. Mr. Demirtas recalls taking his sons to swimming, diving, gymnastics, and Kung Fu lessons. He and friends also frequently rented a boat and took their sons fishing.

In 1984, Mr. Demirtas was diagnosed with severe bronchitis and asthma. He was hospitalized on numerous occasions and eventually placed on disability. Since he could no longer work in a factory, he focused on raising his sons and doing charitable work through his mosque. In addition, when he was able, he continued to fix cars in his home garage, and he taught his sons to do the same.

In 1990, Mr. Demirtas moved his family back to Turkey in the hopes that the climate would be beneficial for his bronchitis and asthma. They stayed in Turkey for three years. In 1993, one of his sons was hit by a car and broke his hip. Dissatisfied with the medical care his son was receiving in Turkey, Mr. Demirtas decided to move his family back to Tilburg, where his family continues to reside today. Back in Tilburg, Mr. Demirtas again focused on raising his sons, fixing cars, and doing charitable work through his mosque.

Mr. Demirtas also traveled to provide food and clothing to victims of natural disasters. He met his second wife, Rabiya, when he traveled to Bulgaria to distribute food and clothing to the victims of a flood. They married in a religious, but not civil, ceremony in 2003, and lived in Turkey, near where Mr. Demirtas's parents were living. In 2005, Rabiya gave birth to their daughter, Fatma.

Mr. Demirtas also traveled to Pakistan to provide aid to victims of the 2005 earthquake, which killed more than 80,000 people and left an estimated 4 million homeless. *See* http://www.history.com/topics/kashmir-earthquake (last visited Nov. 17, 2016). At least one of the videos seized from Mr. Demirtas's home, and provided to undersigned counsel during discovery, documents Mr. Demirtas providing money to victims of the earthquake. As the government will likely emphasize, some videos also contain individuals stating extremist views, but Mr. Demirtas's initial and primary motivation was humanitarian support.

In 2007, when Mr. Demirtas's daughter, Fatma, was just two years old, she fell from the family's sixth floor apartment in Turkey. The apartment has an enclosed balcony with glass windows. Mr. Demirtas's wife had rolled and stacked several rugs that she intended to send out for cleaning, and placed them on the balcony underneath the window. Their daughter climbed on the rugs, leaned out of the window and fell. Mr. Demirtas was in the Netherlands, visiting his sons, at the time of the accident. When he learned of the accident, he immediately returned to Turkey. When his daughter was found beneath the window, she had no visible signs of injury, but when Mr. Demirtas arrived at the hospital he learned that an MRI revealed that his daughter's back was broken. She was paralyzed from the waist down. Since that time, Mr. Demirtas and his wife have been primarily focused on providing Fatma with the care she needs.

The instant offense occurred in relation to Mr. Demirtas's travel to Pakistan. As documented by the stamps in his passport, Mr. Demirtas traveled to Pakistan each year during the Kurban Bayrami (Eid al-Adha) holiday or "Feast of the Sacrifice." He did so to provide money for and participate in the traditional sacrifice of sheep.[3] Some of the videos seized from Mr. Demirtas's home document his participation in this tradition.

While in Pakistan, Mr. Demirtas met Tohir Can and several other Uzbeks at the opening of a mosque. Later, after observing Mr. Demirtas distributing Kurbani, some of these Uzbeks told Mr. Demirtas that they were staying in a village with a number of Turkish people who also

[3] The Islamic tradition of distributing meat (or Kurbani or Qurbani) to those in need during Eid al-Adha is well documented. For example, Islamic Relief USA ("IRUSA") – an organization that is among those federal employees can contribute to through the Combined Federal Campaign, *see* https://cfctoday.org/who-is-in-the-campaign (last visited Nov. 21, 2016) – organizes a special Qurbani giving program each year. *See* http://irusa.org/udhiyahqurbani/ (last visited Nov. 4, 2016). As the IRUSA notes, for some recipients of this program, the meat provided is the only meat they eat all year. *Id.*

were in need of aid. At their request, Mr. Demirtas traveled with them to a village where he again met Can. As he acknowledged in the Statement of Offense [Dkt. #90], signed in relation to his guilty plea in this matter, Mr. Demirtas provided funds to Can. At some point, Mr. Demirtas was told that Can was from Uzbekistan and had been driven out of his country by the authoritarian government in Uzbekistan, but he was not specifically told about the Islamic Movement of Uzbekistan ("IMU") organization, or that this was the name of Can's organization.[4] Mr. Demirtas saw his donations to Can as an extension of his charitable work and intended the donations to be for Kurbani. Mr. Demirtas was interested in supporting fellow Muslims – he was not specifically seeking to support terrorist activities.[5] Nonetheless, as he

[4] The IMU was formed in opposition to, and with the purpose of overthrowing, the authoritarian rule of Islam Karimov in Uzbekistan. Karimov was the President of Uzbekistan from September 1991, until his death in September 2016. Although an "elected" President, as the United States Department of State reported, the elections were "neither free no fair," and Karimov's government had a "very poor" human rights record, employing official and unofficial means to "severely" restrict the freedom of speech and the press, as well as the freedom of religion, including arresting and harassing Muslims. *See* U.S. Dept. of State, Country Reports on Human Rights Practices, Uzbekistan (Feb. 25, 2004), http://www.state.gov/j/drl/rls/hrrpt/2003/27873.htm (last visited Nov. 17, 2016).

On September 25, 2000, the United States designated the IMU as a Foreign Terrorist Organization. According to a State Department report, prior to October 2001, the group primarily targeted interests in Uzbekistan, but subsequently affiliated with al-Qaida and the Taliban and participated in attacks on U.S. and Coalition forces in Afghanistan. *See* U.S. Dept. of State, Country Reports on Terrorism (Apr. 30, 2007), http://www.state.gov/j/ct/rls/crt/2006/82738.htm (last visited Nov. 17, 2016).

[5] The government has alleged that Mr. Demirtas was appointed by the IMU to be their representative in Europe. This allegation is based on a document found in Mr. Demirtas's home which appoints "Khojah Nasrallah" the IMU's representative in Europe, and a video tape in which Can refers to Mr. Demirtas as "Nasrallah." Since his arrest in 2008, Mr. Demirtas has consistently maintained that he is not the "Nasrallah" referenced in the document. "Nasrallah" is a common Arabic name, meaning "God's help." *See, e.g.*, http://www.muslimnames.info/name/Nasrullah (last visited Nov. 17, 2016); http://imuslim.name/3120-meaning-Nasrullah-muslim-arabic-names.html (last visited Nov. 17, 2016); http://quranicnames.com/nasrullah/ (last visited Nov. 17, 2016) ; http://muslimbabynames.co.uk/nasrullah/ (last visited Nov. 17, 2016). *See also* New York Times, *What's in a Name? Not, It Seems, a Leader of Hezbollah in Lebanon* (Aug. 23,

acknowledged at the plea hearing and in the Statement of Offense, Mr. Demirtas was aware that Can's organization engaged in terrorist activities because he was present when threats of such activities were made.[6]

As a result of his connection to the IMU, on May 16, 2008, Dutch authorities arrested Mr. Demirtas based on a European Arrest Warrant issued by French authorities, alleging that between August of 2006 and May of 2008, Mr. Demirtas participated in a criminal conspiracy with the aim of preparing an act of terrorism and financing a terrorist undertaking.

Mr. Demirtas had never before been charged with or convicted of a criminal offense. As a result of his conduct – the same conduct charged in the instant matter – in January 2013, in Paris, France, Mr. Demirtas was convicted and sentenced to a term of eight years (96 months). On July 17, 2013, he was returned to the Netherlands and released. A Dutch court subsequently reduced his 96-month sentence to a term of 90 months, and because Mr. Demirtas had served more than two-thirds of that sentence, pursuant to Dutch law, he was discharged.

After his release in July 2013, Mr. Demirtas returned to Tilburg. During the following eighteen months, he worked to rebuild his life. His wife and daughter were living in Turkey, and his ex-wife and three sons were living in the family home in Tilburg. His ex-wife would not

---

2006), *available at* http://www.nytimes.com/2006/08/23/world/middleeast/23raid.html?_r=0 ("Hassan Nasrallah, the name of the leader of Hezbollah, is a pretty common name in Lebanon, it turns out."); National Post, *Nazih Nasrallah, who was fired after CSIS tipoff, loses appeal* (Apr. 2, 2012), *available at* http://news.nationalpost.com/news/canada/bureaucrat-who-was-fired-after-csis-tipoff-loses-his-appeal (Nasrallah "'like the name Smith in English'"). Although in the video, Can refers to Mr. Demirtas as Nasrallah or "God's help," Mr. Demirtas is not the "God's help" ("Khojah Nasrallah") referred to in the IMU letter. Moreover, it is not surprising that Can would refer to anyone (and everyone) who helped to support his organization as "Nasrallah" or "God's help."

[6] While in the village with the Uzbeks, Mr. Demirtas was present while the Turks in the village made video tapes for their family members. At the insistence of the Uzbeks, Mr. Demirtas also participated in – and was videotaped – firing weapons at rocks. Although he fired several weapons on this one occasion, he was not training to participate in any IMU activities.

permit him to return to the family home, and with nowhere to live in the Netherlands, he turned to his mosque. The administrator provided him with a place to stay in the basement of the mosque, and he lived there for approximately six months, until he was able to obtain his disability payments and an apartment. After he secured an apartment, Rabiya and Fatma moved to Tilburg to live with him. In 2014, Rabiya gave birth to their second child, Mehmet. Mr. Demirtas focused on caring for Fatma and getting her to and from her medical appointments, and on helping to care for the baby. Adjusting to life after prison, however, was difficult and he suffered from and was treated for depression. *See* Attachment A (Letter from Doctor).

In preparation for sentencing in this matter, undersigned counsel traveled to Tilburg and interviewed a number of Mr. Demirtas's family members and friends who live in the Tilburg area. These individuals confirmed that after serving his sentence in France, Mr. Demirtas was devoted to helping his family and other members of the community in Tilburg. Submitted under separate cover is a DVD with statements of support from some of these individuals, along with a letter from one of his sons and a letter from his wife, Rabiya. The individuals counsel met with in Tilburg discussed with counsel, at length, many specific instances when Mr. Demirtas went out of his way to help care for members of the community, helping others with everything from coping with mental health issues to car troubles.

During counsel's visit to Tilburg, the current and former administrator of a local mosque that Mr. Demirtas attended also explained that during the time between Mr. Demirtas's return to Tilburg in July 2013 and his arrest in Germany in 2015, Mr. Demirtas did not express extremist views. The former administrator discussed with undersigned counsel the importance of teaching young people within the mosque that Islam does not support violence, and he noted that – based on conversations he had with Mr. Demirtas after his release from France – Mr. Demirtas

supported this view. The current administrator also explained that as the administrator of the mosque, he maintains close ties with law enforcement within the area and that when these officials have concerns about any member of his mosque, they raise these concerns with him. He noted that no such concerns were raised regarding Mr. Demirtas after his return to Tilburg.

In January 2015, Mr. Demirtas took his wife and young children to visit his mother in Turkey. On their return from Turkey, they traveled through the Düsseldorf airport. There, Mr. Demirtas was arrested on the red notice that had been issued in 2012 in relation to the warrant issued in the instant matter in 2011.

At the time of Mr. Demirtas's January 2015 arrest, Rabiya was pregnant with the couple's third child. She gave birth to their daughter, Ayse, after Mr. Demirtas was transferred to the United States, and Mr. Demirtas has not yet met Ayse.

Until his arrest on January 12, 2015, Mr. Demirtas was completely unaware that the United States had charged him on December 8, 2011, based on the same acts for which he was convicted and sentenced in France. Following extradition proceedings, on July 17, 2015, Mr. Demirtas was transferred to the United States and made his initial appearance before the Court. He has been held without bond since that date.

With the exception of a couple of weeks when he was in the infirmary at the Central Treatment Facility, for the last 16 months, Mr. Demirtas has been held at the District of Columbia Central Detention Facility ("D.C. Jail"). Although he has not been charged with directly committing any violent act, he has been continuously held in the administrative segregation unit solely because of the nature of the charges against him. In administrative segregation, he is on 24-hour lock-down in a cell that has no windows to the outside, and only a small (approximately 6 inches by 12 inches) window in the door to the cell. He is not permitted

to interact with other inmates. He has been permitted to leave his cell only for 15 minutes each weekday to take a shower, and for visitation and family telephone calls. He has not left his cell on weekends and has not been permitted access to any recreation area. His family has not been able to afford to travel from the Netherlands to visit him, and thus, he has only been visited by his legal counsel and, on a couple of occasions, the Dutch consulate. He also has had only limited telephone contact with his family because, until recently, the jail required counsel to arrange all international family calls with an interpreter. In addition, Mr. Demirtas's inability to speak English and communicate with jail staff and other inmates has further isolated him within the jail.

These conditions have been exacerbated by a number of medical conditions. In addition to asthma and chronic bronchitis, while detained, Mr. Demirtas has suffered with very painful kidney stones, a perirectal abscess, and an inguinal hernia. The conditions of detention and medical conditions have taken a significant toll on Mr. Demirtas's mental health – he has felt as if he has been "losing his mind." As noted above, he was diagnosed as suffering from depression prior to his incarceration, and this condition has been aggravated. All of these conditions have made the 16 months Mr. Demirtas has spent at the jail much more difficult and more impactful.

## Argument

### I. OBJECTION TO PRESENTENCE INVESTIGATION REPORT GUIDELINE CALCULATION USING § 2M5.3(b)(1)(E) ENHANCEMENT.

The Presentence Investigation Report ("PSR") calculates the applicable sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to include a 2-level enhancement to the base offense level pursuant to U.S.S.G. § 2M5.3(b)(1)(E). That section provides: "If the offense involved the provision of . . . funds or other material support or

resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by 2 levels." As acknowledged in the Statement of Offense [Dkt. #90], Mr. Demirtas provided funds to Tohir Can, and he was present when Can said that the funds would be used to support his organization. Although Mr. Demirtas has acknowledged that he knew Can's organization engaged in terrorist activities, Mr. Demirtas did not intend, know or reasonably believe that the money he gave to Can would be used to assist with any act of violence, as opposed to being used to assist the organization in some other way, such as by providing food, shelter, clothing or other items to members of the organization. Specifically, Mr. Demirtas provided money intending that it would be used for "Kurban." *Cf. United States v. Aref* , 04-cr-402, 2007 WL 804814, at *1 (N.D.N.Y. Mar. 14, 2007) (2 level adjustment applied where evidence supported finding that material support provided to be used in attack on Pakistani Ambassador in New York City). For this reason, the § 2M5.3 enhancement should not be applied here.

Although the application of the enhancement requires "knowledge" or "reason to believe" the funds provided will be used to commit or assist in the commission of a violent act, the PSR applies the enhancement based only on the theory that funds provided could be "comingled." PSR at 20. While the idea that funds will be "comingled" is sufficient to support a conviction for material support, it does not support the specific finding necessary for the application of the two level enhancement – otherwise the enhancement would apply in every case. The PSR also erroneously places the burden on Mr. Demirtas to submit evidence "supporting separation of funds or specific designation of the funds contributed." *Id.* To the contrary, the burden is on the government to produce evidence supporting a finding that Mr. Demirtas knew or had reason to know the funds would be specifically used to commit a

violent act. *See In re Sealed Case,* 552 F.3d 841, 846 (D.C. Cir. 2009) (government bears burden of proving facts to support sentence enhancements). Absent such proof, the enhancement cannot be applied.

The elimination of the 2-level enhancement under § 2M5.3(b)(1)(E) does not, however, change the final sentencing range recommended under the Guidelines. Without the enhancement, the applicable offense level, using a base offense level of 26 and applying the 12-level terrorism enhancement and the 3-level reduction for acceptance of responsibility, is level 35. Because the terrorism enhancement requires a criminal history category VI, even without the 2-level enhancement under § 2M5.3(b)(1)(E), the range is greater than the statutory maximum, and therefore, becomes the statutory maximum of 180 months.

## II. REVIEW OF 18 U.S.C. § 3553(a) SENTENCING FACTORS DEMONSTRATES SENTENCE OF TIME SERVED IS APPROPRIATE.

When imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the Sentencing Guidelines];

> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

**A. The United States Sentencing Guidelines.**

As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the United States Sentencing Guidelines is 180 months, the statutory maximum sentence. However, when sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a)

require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 128 S.Ct. at 598 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

When considering the sentence recommended by the Guidelines in this case, the Court should consider that the Guidelines, in fact, provide no true guidance regarding the appropriate sentence within the applicable statutory sentencing range for defendants who violate § 2339B and are subject to the terrorism enhancement under U.S.S.G. § 3A1.4. The statute provides for a sentencing range of zero to 180 months incarceration. Section 2M5.2(a) of the Guidelines provides for a base offense level of 26 for a violation of § 2339B, and the 12-level terrorism enhancement found in § 3A1.4 applies to any felony involving a federal crime of terrorism.[7] The application of the terrorism enhancement to violations of § 2339B guarantees that the

[7]A federal crime of terrorism is defined in 18 U.S.C. § 2332b(g)(5) as any violation of one of the enumerated offenses (including § 2339B) that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The application of the enhancement requires a finding that the defendant had the specific intent to influence or affect the conduct of a government or retaliate against a government. *See United States v. Chandia*, 365 F.3d 514, 376 (4th Cir. 2008) (without evidence that material support provided for violent terrorist acts, mere act of supporting terrorist organization not sufficient for application of terrorism enhancement, and remand required for determination of defendant's specific intent). Here, as part of the plea agreement, the government required Mr. Demirtas to agree not to contest the application of the terrorism enhancement, although the Statement of Offense does not contain evidence of specific intent. Without the terrorism enhancement, Mr. Demirtas's offense level would have been a level 23, with a criminal history category I, and a range of 46 to 57 months.

recommended "range" will be the statutory maximum of 15 years, because the offense level is at least level 38 (26 base offense level, plus 12 levels for terrorism enhancement), and pursuant to § 3A1.4(b), the criminal history category is category VI. Even with a 3-level reduction for acceptance of responsibility, the sentencing range is well over the 180-month statutory maximum and, therefore, becomes the statutory maximum for every defendant. Thus, the Guidelines provide no true guidance as to where within the statutory range (0 to 180 months incarceration), a particular defendant should be sentenced.

The Guidelines' recommendation of equal punishment of 180 months for violations of § 2339B should be given no weight. As one court noted when sentencing a defendant who, like Mr. Demirtas, entered a guilty plea to one violation of § 2339B, "while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment." *United States v. Warsame*, 651 F. Supp. 2d 978, 981 (D. Minn. 2009) (imposing sentence of 92 months for defendant who attended al Qaeda training camp and maintained contact with and sent money to al Qaeda associates after returning to the United States); *see also United States v. Aref*, 04-cr-402, 2007 WL 804814, *3 (N.D.N.Y. 2007) (terrorism enhancement's application of criminal history category VI for defendant with no prior criminal history over-represents criminal history and warrants departure). Because the Guidelines do not distinguish between defendants convicted of violating § 2339B, the Court should instead look to the remaining § 3553(a) factors. *See United States v. Nayyar*, 09-cr-1037, 2013 WL 24365764, *8 (S.D.N.Y. Jun. 5, 2013) (finding that application of terrorism enhancement obscured differences between non-violent violations of § 2339B and violations that result in actual harm).

**B. The Nature and Circumstances of the Offense.**

As set forth in the Statement of Offense, Mr. Demirtas provided funds to Tohir Can, who was the leader of the Islamic Movement of Uzbekistan ("IMU"). Without question, any support provided to individuals engaged in terrorism is deplorable. Nonetheless, it is important to note that Mr. Demirtas did not engage in or directly support a violent act, and he did not sanction any terrorist act or intend to support any attack on civilians or any other specific target.

**C. Acceptance of Responsibility.**

Mr. Demirtas deeply regrets providing funds to Tohir Can and fully accepts responsibility for doing so. As was apparent at the plea hearing, entering a guilty plea in this matter nonetheless was difficult for Mr. Demirtas. This difficulty, however, arose not because Mr. Demirtas fails to acknowledge and accept responsibility for his actions, but for reasons unrelated to acceptance of responsibility. First, as discussed above, although he knew that Can's organization threatened terrorist acts, Mr. Demirtas did not provide the funds to Tohir Can intending specifically to support any terrorist act. Because his goal was to help fellow Muslims, it has been difficult for him to understand how his conduct violated the law. Second, because no part of his offense occurred in the United States or near United States interests abroad, it was particularly difficult for Mr. Demirtas to understand that he violated United States law. Finally, Mr. Demirtas was convicted in France -- and served his sentence in France -- for his association with and support of Tohir Can. Mr. Demirtas was then released and lived a law-abiding life for 18 months before being arrested for a second time for the same conduct. It has been difficult for Mr. Demirtas to understand that the United States can impose a second punishment for the same conduct. Once Mr. Demirtas understood and accepted that the United States, as a separate sovereign, can impose a separate punishment, and that providing any support to a terrorist

organization – regardless of intent or the nature of the support – is a criminal offense, he accepted responsibility by entering a guilty plea, saving the government the expense of a lengthy trial involving numerous foreign witnesses.

The Court should credit Mr. Demirtas's acceptance of responsibility when determining an appropriate sentence. Imposition of the 180-month statutory maximum sentence that the government requests would deny Mr. Demirtas any credit for acceptance of responsibility by imposing the same sentence that is imposed on defendants who fail to accept responsibility and are convicted of violating § 2339B after trial. *See, e.g., United States v. Nayyar*, 09-cr-1037, 2013 WL 24365764 (S.D.N.Y. Jun. 5, 2013) (defendant convicted after trial of multiple counts of material support and conspiring to traffic in firearms and ammunition, relating to support of Hizballah, sentenced to 180 months); *United States v. Hawo Mohamed Hassan*, 10-cr-187-02, Dkt. #255 (D. Minn. May 29, 2013) (defendant convicted after trial of one count of conspiracy to provide material support and two counts of making a false statement sentenced to 120 months); *United States v. Chandia*, 514 F.3d 365, 370-71 (4th Cir. 2008) (defendant convicted after trial of three counts of providing material support to terrorists and terrorist organizations after attending training camp run by Lashkar-e-Taiba (LET) in Pakistan and assisting LET leader in United States sentenced to total of 180 months incarceration);[8] *United States v. Mohammed Mosharref Hossain*, 04-cr-402, 2007 WL 804814 (N.D.N.Y. 2007) (defendant convicted after trial of twenty-seven counts, including money laundering and conspiracy to provide material

[8]The Fourth Circuit remanded for resentencing in *Chandia*, and the district court again imposed a total sentence of 180 months incarceration. *See United States v. Chandia*, 05-cr-401 (CMH), Dkt. #271 (E.D.Va. Mar. 14, 2011).

support, in relation to plot to illegally import a Surface-to-Air Missile to be used in an attack on the Pakistani Ambassador in New York City, sentenced to 180 months).[9]

**D. Age and Lack of Prior Record.**

Mr. Demirtas is 59 years old and, apart from his conviction in France for the same acts that led to his conviction here, he has never before been convicted on any criminal offense. His age and lack of a prior record support a variance. The United States Sentencing Commission has identified increased age as a powerful predictor of reduced recidivism. U.S.S.C., *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005), at 13-15, *available at* http://www.ussc.gov/ sites/default/files/pdf/research-and-publications/research-publications/2005/ 20050104_Recidivism_Salient_Factor_Computation.pdf. The Sentencing Commission has reported that "[r]ecidivism rates decline relatively consistently as age increase." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), at 12 & Ex. 9, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[9]Counsel anticipates that the government will argue that Mr. Demirtas received the benefit of his acceptance of responsibility through the plea agreement, which permitted him to avoid a conviction for Count Four of the indictment, charging possession of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), which carries a 30-year mandatory minimum penalty. However, as set forth in Defendant's Motion to Dismiss Count Four of the Indictment for Failure to State an Offense [Dkt. #26], Mr. Demirtas could not have been convicted of a violation of § 924(c) because the definition of a crime of violence in § 924(c)(3)(B) is unconstitutional. The Supreme Court has held that the definition of a "violent felony" in 18 U.S.C. § 924(e)(2)(B) – which is similar to the definition in § 924(c)(3)(B) – is unconstitutionally vague. *See Johnson v. United States*, 135 S.Ct. 2551, 2557 (2015). Even if the definition in § 924(c)(3)(B) is not similarly unconstitutional, here, the underlying material support and receiving military-type training charges against Mr. Demirtas do not qualify as crimes of violence because they do not involve "a substantial risk that physical force against the person or property of another may be used *in the course of committing the offense*," as required by § 924(c)(3)(B).

Sentences imposed on older offenders also have harsher effects, supporting a finding that a lesser sentence can achieve the goals of sentencing. Any sentence is a greater proportion of an older offender's remaining life. *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness). Older offenders who commit their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and are "easy prey" for more experienced inmates. *See* U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/2004/018735.pdf. Older offenders also are more likely to have medical issues and suffer from mental health problems, and therefore, they are more likely to suffer greater punishment than the average inmate. *See* Laura Maruschak, *Medical Problems of Prisoners*, Bureau of Justice Statistics, Tables 1, 2, 4 (Apr. 2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/mpp.pdf; Katie Gray, *America's Aging—and Mentally At-Risk—Prisoners*, The Crime Report (Nov. 7, 2016), *available at* http://thecrimereport.org/2016/11/07/americas-aging-and-at-risk-prisoners/#.

The Court should also consider that aging inmates also are more costly to incarceration. *See* U.S. Dept. Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons at i (May 2015, revised February 2016) ("aging inmates," defined as inmates 50 years old or older, more costly to incarcerate due to increased medical needs), *available at* https://oig.justice.gov/reports/2015/e1505.pdf.

A number of courts have found that advanced age supports a below guidelines sentence. *See, e.g., United States v. White*, 506 F.3d 635, 647 (8th Cir. 2007) (upholding downward

variance for 51-year-old defendant, based in part on age); *United States v. Martinez,* Crim. No. 99-40072, 2007 WL 593629, at *2 (D. Kan. Feb. 21, 2007) (notifying counsel that non-guideline sentence being considered based, in part, on defendant's age, referencing recidivism reports showing increased age and first offender status show decreased likelihood of recidivism); *United States v. Ruiz*, Crim. No. 04-1146-03, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (noting several courts have imposed non-guideline sentences for defendants over 40 based on markedly reduced recidivism, citing recidivism study); *United States v. Cannaday*, No. 08-172, 2009 WL 1587183, at *3 (E.D. Wis. June 5, 2009) (imposing reduced sentence for 46-year-old defendant, citing the Commission's report showing that "recidivism tends to decline among those around defendant's age"); *see also United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (vacating sentence because district court erroneously concluded age, among other factors, could not support downward variance); *cf.* U.S.S.G. § 5H1.1 (age, "individually or in combination with other offender characteristics," may be basis for departure).

**E. Family**

After serving the sentence imposed in France for the same acts charged in the instant matter, Mr. Demirtas rebuilt his life in the Netherlands and worked hard to establish a home for his wife and daughter, Fatma, who was eight years old when he returned. He knew that his wife, Rabiya, had spent the previous five years, while he was incarcerated in France, struggling to care for Fatma, who is paralyzed and has numerous medical needs. He was completely unaware that the United States had issued a warrant for his arrest. With no knowledge that he could again be taken from his family for the same acts for which he had served his French sentence, Mr. Demirtas and his wife had a second child in 2014, and his wife was pregnant at the time of Mr. Demirtas's 2015 arrest on the warrant issued in this case. Mr. Demirtas feels overwhelming

remorse for leaving his wife to care for Fatma and their two young children without his help. He is fortunate that his son, Recep, has stepped in to help Rabiya as much as possible, but Recep recently married and Mr. Demirtas also feels remorseful that he has left his son with the burden of helping to care for his younger siblings. Mr. Demirtas wants nothing more than to return to his wife as soon as possible in order to help her raise their two very young children and care for Fatma. His dedication to his family is a strong incentive for him to avoid any contact with individuals who have or support extremist views.

**F. Medical Conditions**

Mr. Demirtas's medical conditions, including chronic bronchitis, asthma, an inguinal hernia, and depression, have aggravated the conditions of his detention at the D.C. Jail. Although if the Court imposes an additional term of incarceration, Mr. Demirtas would serve that term within the Bureau of Prisons ("BOP"), any additional incarceration is likely to continue to be more severe than it would be absent Mr. Demirtas's medical conditions. While the BOP strives to provide adequate medical care to all inmates, there have been numerous reports of inadequate care even for the most common disorders. In a 2008 report, the Inspector General of the Justice Department criticized the health care provided by BOP, finding that BOP institutions did not provide preventive health care and, in many instances, did not provide required medical services or properly monitor inmates with chronic care conditions. *See* U.S. Dept. of Justice Office of Inspector General, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care* (Feb. 2008), at ii, 32, 34 *available at* www.justice.gov/oig/reports/BOP/a0808/final.pdf; *see also The Health and Health Care of U.S. Prisoners: Results of a Nationwide Survey*, American Journal of Public Health (April

2009); *Curing the BOP Plague with Booker: Addressing Inadequate Medical Treatment the Bureau of Prisons*, 41 John Marshall L.R. 219 (2007). A study completed earlier this year by the Office of the Inspector General demonstrates that the problems with medical services within BOP persist. *See* U.S. Dept. of Justice Office of Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016), at i, *available at* https://oig.justice.gov/reports/2016/e1602.pdf (finding that BOP has a difficult time recruiting medical professionals and staffing shortages are widespread, limiting inmate access to medical care). These problems support a finding that the time Mr. Demirtas has already served for his actions (here and in France) constitutes sufficient punishment and further incarceration would be excessively punitive and more than necessary to serve the purposes of sentencing.

**G. Post-Offense Rehabilitation.**

Here, the Court also has an unusual glimpse into what Mr. Demirtas's conduct will be post-release. He served his sentence in France for the same conduct at issue here, was released, and lived in his community for 18 months. His conduct after his release demonstrates post-offense rehabilitation and supports a sentence of time served.

In relation to the French charges, Mr. Demirtas spent 62 months incarcerated. During that time, his father died, and he was not able to be there to console his mother. He also could do nothing to help as his wife struggled to care for their handicapped daughter. He knew that it was his own actions that prevented him from being there for his family and felt tremendous guilt for leaving them when they needed him most. After his release, he fully committed himself to caring for his family. During the 18 months between his release following his French conviction and his arrest in Germany in the instant matter, Mr. Demirtas demonstrated his intent to live a

law-abiding life, support his family, and have no contact with the IMU or any other extremist organizations. *Cf. Pepper v. United States*, 562 U.S. 476, 490-91 (2011) (when defendant's sentence set aside and remanded for resentencing, sentencing court can consider postsentencing rehabilitation which may be "highly relevant" to several of the § 3553(a) factors, including the history and characteristics of defendant and likelihood of recidivism). As the Supreme Court has noted, "[p]ostsentencing rehabilitation may [] critically inform a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.* at 491.

Post-offense rehabilitation is particularly significant in terrorism cases. The sentencing guidelines for terrorism offenses are high because the Sentencing Commission has noted that deterring and rehabilitating those who commit terrorism offenses is difficult, making incapacitation for longer periods of time necessary. *See United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015). Where, as here, the defendant has demonstrated post-offense rehabilitation, the argument that imposing a long term of incarceration is necessary because this is a terrorism case is eroded.

**H. Time Served in the Netherlands and France.**

As noted above, Mr. Demirtas was first arrested for the acts charged in this case on May 16, 2008, when Dutch authorities arrested him based on a European Arrest Warrant issued by French authorities. He subsequently was delivered to France, where he was detained on charges related to his involvement with the IMU. *See* Memorandum Opinion and Order [Dkt. #87] at 1-2. He was convicted in France of participating in a criminal conspiracy with the aim of preparing an act of terrorism and financing a terrorist undertaking between August 1, 2006 and May 19, 2008. *See* [Dkt. #78-7] at 31. There is no dispute that his convictions in France were

based on the same acts that are the basis for the charge of conviction in this matter. *See* Plea Agreement [Dkt. # 89] at 6. Thus, the offenses of conviction in France constitute "relevant conduct" under U.S.S.G. § 1B1.3.

The Guidelines provide that sentences should be imposed concurrent with any other sentence resulting from another offense that is relevant conduct to the instant offense. U.S.S.G. §§ 5G1.3, 5K2.23. Section 5G1.3 applies to undischarged terms of imprisonment, and provides that the Court should adjust any term of imprisonment to account for any period of imprisonment already served for an offense that constitutes relevant conduct, if the court determines that the Bureau of Prisons will not credit the defendant for that time served. *See* U.S.S.G. § 5G1.3(b)(1). Section 5K2.23 applies the same principle to discharged terms of imprisonment, such as the term Mr. Demirtas served for the French convictions.

Because the 62 months that Mr. Demirtas served in France and the Netherlands were for the same acts that he is charged with in the instant matter, the Court should credit this time by subtracting this period from any term of imprisonment the Court determines is appropriate. The Court not only should subtract the 62 months served, but also should subtract the nine months and nine days of good time credits (54 days per year) that Mr. Demirtas would have earned on the 62 months served. With good time credit, the time Mr. Demirtas served in France and the Netherlands is the equivalent of a sentence of 71 months and 9 days. Because the Bureau of Prisons will not give Mr. Demirtas credit for this time, the Court should subtract it from any sentence the Court would otherwise impose.

**I. Time Served in Germany and at the District of Columbia Jail.**

Mr. Demirtas has been detained in this case since his arrest in Germany on January 12, 2015. As of the sentencing date, November 30, 2016, Mr. Demirtas will have served 22 months

and 18 days, which, as the government agrees, should be credited to any sentence. *See* Plea Agreement [Dkt. #89] at 6. With good time credits (54 days per year), this is the equivalent of a sentence of 26 months. With the time served in France and the Netherlands and good time credits included, Mr. Demirtas has served the equivalent of more than a 97-month sentence.

When considering the time that Mr. Demirtas has served, the Court should also consider that the more than 16 months served at the D.C. Jail have been particularly punishing. *See Warsame*, 651 F. Supp. 2d at 982 (defendant's pretrial confinement under conditions significantly more onerous than conditions faced by ordinary pretrial detainees comparable to a longer period of time served in federal prison). Because of the nature of the charges in this case, Mr. Demirtas has been in the administrative segregation unit since his first appearance in the District of Columbia on July 20, 2015. In administrative segregation, with the exception of 15 minutes per day on the weekdays and a limited number of legal and consular visits, he has been confined to his cell. He has been further isolated by the language barrier. He has not seen his family and has had only limited access to family telephone calls. Under these isolating conditions, he has endured physical pain and his depression has been exacerbated. These conditions have taken a significant toll on Mr. Demirtas, and the extraordinarily difficult conditions of his detention make the time that he has served at the D.C. Jail comparable to a longer sentence.

**J. Status as an Alien.**

If the Court were to impose an additional term of incarceration, Mr. Demirtas would continue to face more punishing conditions of detention than most prisoners, not only due to the language barrier, the lack of contact with family, and his physical and mental conditions, but also due to his status as a deportable alien, which likely would increase the severity of his

confinement and the length of his term of incarceration by eliminating the possibility of going to a halfway house. *See United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (non-guideline sentence may be appropriate because defendant's status as deportable alien would increase length and severity of sentence). Any additional term would be served within the BOP, and even if he were not placed in isolation, as he is at the D.C. Jail, the BOP rules and regulations provide for differential treatment for aliens. The differences include, but are not limited to:

- Deportable aliens are not eligible for early placement into a halfway house or home confinement and must serve the entire length of their sentences, less good time credit;

- Status as a deportable alien increases a prisoner's housing classification level and requires placement in at least a low security institution, eliminating the possibility of placement in a minimum security facility or prison camp;

- Under 28 C.F.R. § 345.35, deportable aliens are not eligible to work while in prison in the Federal Prison Industries Program; and

- Deportable aliens are frequently, if not always, ineligible for vocational training.

In short, because he is a deportable alien, Mr. Demirtas would not receive the same benefits of programs within the BOP as other prisoners. Because Mr. Demirtas's status as a deportable alien, therefore, would increase both the severity and the length of his sentence, a variance is appropriate. A variance is particularly appropriate here because Mr. Demirtas did not illegally enter the United States. He was lawfully brought to the United States for the purpose of prosecution. If Mr. Demirtas had illegally entered the United States in addition to committing the criminal offense against the United States for which he is being sentenced, a more severe sentence (in the form of the BOP restrictions) arguably might be warranted, but Mr. Demirtas did not do so. *See Smith*, 27 F.3d at 655 (reduced sentence warranted when increased severity undeserved).

**K. Convention on the Transfer of Sentenced Persons.**

During the hearings on Defendant's Motion to Dismiss Indictment for Violation of Constitutional Right to Speedy Trial [Dkt. #24], the defense presented evidence that the government could have obtained Mr. Demirtas's appearance before the Court sooner that it did by seeking extradition from France, with the consent of the Netherlands. *See* Memorandum Opinion and Order [Dkt. #87] at 59 (Sept. 2, 2016). The evidence demonstrated that the Netherlands could have given such consent, but would have done so only if the United States provided a guarantee that Mr. Demirtas would be returned to the Netherlands to serve any sentence imposed in the United States. *Id.* at 37. The Court denied Mr. Demirtas's motion, finding that the government's failure to pursue this course was not unreasonable. *Id*. at 59. Nonetheless, the government should not be permitted to benefit – by obtaining a longer term of incarceration – from the failure to do what was necessary to secure Mr. Demirtas's appearance before the Court in the most expeditious manner.[10]

[10] This is particularly true where the evidence demonstrated that the government agents involved in discussions of Mr. Demirtas's potential extradition were well aware of the common extradition concept of obtaining third-country consent. *See* Mem. Op. and Order [Dkt. #87] at 46. In addition, the Court excused the government's failure to seek custody of Mr. Demirtas after his prosecution in France concluded, finding that the government reasonably believed it would receive notice before Mr. Demirtas was released from French custody, citing testimony of Monique Roth. *Id.* at 50. Ms. Roth's testimony, however, referred only to a delay in release – and notice – that would occur if Mr. Demirtas was not convicted in France – "any court decision that would result in [Demirtas's] freedom." *See* Dkt.#79-8 (discussion of options "in the event that the case goes bust in France and results in no conviction"); Tr. 8/3/2016 at 41-42 (same); Tr. 8/4/2016 at 90-91 ("the French had said under their law, there are 10 days before they will release a prisoner even if the charges are dropped"). There was no testimony that the U.S. would receive any further notice following Mr. Demirtas's conviction and sentencing – which the U.S. was notified of in January 2013. *See* Mem. Op. and Order at 8. Moreover, the French had only represented that they would not turn Mr. Demirtas over to U.S. authorities while the French prosecution was ongoing and that they had an obligation to return him to the Netherlands. Thus, the government had no basis for not acting after the French prosecution was concluded in January 2013, while Mr. Demirtas remained in France.

Both the United States and the Netherlands are signatories to the Convention on the Transfer of Sentenced Persons, T.I.A.S. No. 10824, 22 I.L.M. 530 (1983), which would permit the transfer of Mr. Demirtas to the Netherlands to serve his sentence. *See* http://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/112/signatures?p_auth=J2H1L1Wd; s*ee also* The Transfer of Offenders to and from Foreign Countries Act, 18 U.S.C. § 4100 (authorizing transfer of offender to serve sentence in country of which offender is citizen or national, when treaty authorizing transfer in force). If the government had timely sought Mr. Demirtas's extradition from France, he would have been guaranteed his return, pursuant to the Treaty, to the Netherlands to serve any sentence. Once returned to the Netherlands, a Dutch court would have reduced the sentence to time served, as it did with the French sentence. Because the government did not seek extradition from France, Mr. Demirtas is not guaranteed his return to the Netherlands. The Court cannot require the government to return Mr. Demirtas to the Netherlands pursuant to the Treaty, because the transfer decision is solely within the discretion of the Attorney General. *See Bagguley v. Bush*, 953 F.2d 660, 662 (D.C. Cir. 1991) ("the Act and the Treaty give the Attorney General unfettered discretion with respect to transfer decisions"). The Court, however, can ensure that the government does not benefit from its negligence by imposing the sentence a Dutch court would impose, time served – thus ensuring that Mr. Demirtas is treated as he would have been if the government timely sought his extradition from France.[11]

[11] Alternatively, if the Court imposes more than a sentence of time served, Mr. Demirtas respectfully requests that the Court recommend that the Attorney General authorize Mr. Demirtas's transfer to serve his sentence in the Netherlands. *See, e.g., United States v. Ali Yasin Ahmed*, 12-cr-661, Dkt. #343 (E.D.N.Y. Jan. 20, 2016) (sentencing defendant to 132 months and recommending that the Bureau of Prisons send defendant back to Sweden for incarceration).

**L. The Need to Avoid Unwarranted Disparities.**

Notwithstanding the sentencing range recommended by the Guidelines, statistics from the United States Sentencing Commission demonstrate that a sentence of time served would not create an unwarranted disparity when compared to sentences imposed in similar matters. Attached is a chart obtained from the database of sentencing information maintained by the Sentencing Commission. *See* Attachment B (U.S.S.C. statistics). The chart sets forth the sentences imposed in every case in fiscal years 2006 through 2015, in which, like the instant matter, the base offense level was determined under U.S.S.G. § 2M5.3; a 12-level increase was applied for terrorism under § 3A1.4; and a 3-level reduction was applied for acceptance of responsibility under § 3E1.1. The chart includes both defendants who received a 2-level increase for weapons or violent acts under § 2M5.3(b)(1) – the enhancement contested above – and those that did not receive such an increase. The chart excludes defendants who, unlike Mr. Demirtas, received a departure for cooperation under § 5K1.1, and excludes defendants who were sentenced to more than 180 months (and therefore, unlike Mr. Demirtas, necessarily were convicted of more than only one count of § 2339B). As the chart demonstrates, of the 52 defendants sentenced within these parameters between 2006 and 2015, 18 received the 180-month sentence the government requests in this matter. However, half of those 18, were convicted of more than one offense and were facing a sentence of more than 180 months. Thus, only 9 were, like Mr. Demirtas, facing a maximum of 180 months and were sentenced, as the government now asks the Court to sentence Mr. Demirtas, to that maximum. Sixty-five percent (34) of the 52 defendants were sentenced to less than 180 months, and more than half of those (18) were sentenced to less than the 97-month term Mr. Demirtas requests.[12]

[12] The average sentence was 122 months, and the median sentence was 120 months.

A number of reported cases support the sentence Mr. Demirtas requests. For example, in August 2009, a Minnesota district court sentenced a defendant to a 92-month term of incarceration following a guilty plea to a § 2339B violation. *See Warsame*, 651 F. Supp. 2d at 981. The defendant had attended several al Qaeda training camps in 2000 and 2001, and then provided "his services to al Qaeda as a security guard and by teaching English at a medical clinic for al Qaeda associates." *Id.* at 980. After returning to Canada in April 2001, the defendant maintained contact with al Qaeda associates and sent money back to the commander of one of the al Qaeda training camps, "for the brothers," knowing the money would support al Qaeda. *Id.*

In determining that a 92 month sentence was appropriate, the *Warsame* court found two cases that were comparable: "the cases of Salim Hamdan, often described as the personal driver of Usama bin Laden, and the 'Lackawanna Six.'" *Id.* at 982. The Court noted:

> Hamdan was accused of acting as bin Laden's driver; arranging for the transportation of, and then actually transporting, weapons used by al Qaeda; attending al Qaeda training camps; and receiving weapons training. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 570, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). Despite these relatively weighty responsibilities within al Qaeda and Hamdan's close nexus with al Qaeda's leadership, a military jury sentenced him to 66 months of imprisonment or less than the time that Warsame [and Demirtas] has already served.
>
> Even more similar are the circumstances of the 'Lackawanna Six.' In that case, six defendants were accused of traveling from the United States to Pakistan and then to an al Qaeda training camp in Afghanistan. *See United States v. Goba*, 240 F.Supp.2d 242, 244-45 (W.D.N.Y. 2003). The defendants allegedly received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by bin Laden looking ahead to a fight against Americans. *Id.* The defendants then returned to the United States, and in searches of their apartments following their arrest, authorities discovered a gun, a document justifying suicide as a form of martyrdom, and an email allegedly cryptically referring to a future terror operation. *Id.* at 256. Those defendants ultimately received sentences ranging from 84 to 120 months.

651 F. Supp. 2d at 982.

More recently, defendants who have committed more egregious acts have been sentenced to little more than the sentence Mr. Demirtas seeks here. In 2014, a New York district court sentenced a defendant to 108 months incarceration following his guilty plea to conspiracy to provide material support to a foreign terrorist organization (with a maximum possible sentence of 180 months) and conspiracy to bribe public officials (with a maximum possible sentence of 60 months). *United States v. Thavaraja*, 740 F.3d 253, 255, 258 (2d Cir. 2014). In that case, the defendant had been the principal procurement officer for a terrorist organization (the LTTE) and had purchased at least $20 million worth of weapons and materials used to make suicide bombs. *Id.* at 256. In sentencing the defendant to a term of 108 months, the district court found that the defendant was a person of "'substance and decency"' with no prior criminal record, who was not motived by "'power'" or "'self-aggrandizement,'" but by a desire to help his people who were involved in a civil war, and that the defendant was not voluntarily in the United States, but rather was extradited for prosecution. *Id*. at 260. Similarly, Mr. Demirtas's primary motivation was to assist fellow Muslims, and throughout his life, he has focused on providing charitable assistance. The video tapes seized in relation to this case demonstrate that Mr. Demirtas intended the money he provided to Tohir Can to be used for the Kurban sacrifices and to feed people. In addition, the IMU, like the LTTE, was established in response to human rights abuses and religious persecution in the group's country of origin (Uzbekistan). Moreover, unlike the defendant in *Thavaraja*, Mr. Demirtas's acts are not tied to specific terrorist acts.

Earlier this year, a New York district court rejected the government's request for sentences of 180 months for three defendants who traveled to Somalia and joined al-Shabaab, an al Qaeda-affiliated terrorist organization responsible for numerous attacks against U.S. targets.

*See United States v. Ali Yasin Ahmed, Madhi Hashi, and Mohamed Yusuf*, 12-cr-661, Dkt. # 339 (E.D.N.Y. Jan. 8, 2016) (government's sentencing memorandum). Two of the defendants, Ahmed and Yusuf, not only received training, but also fought in brutal battles for control of Mogadishu, in an effort to overthrow the Somali government. *Id.* at 3. The third defendant, Hashi, traveled to Somalia and associated with an al-Shabaab suicide bomber and was alleged to have affiliated with a deadly suicide bomber program. *Id.* at 4, 10. All three defendants had numerous ties to other alleged terrorists. *Id.*at 11-12. The court sentenced Ahmed and Yusuf – who had fought on behalf of al-Shabaab to 132 months, and sentenced Hashi, who had traveled and affiliated himself with a suicide bomber program, but did not engage in armed combat, to 108 months. *Id.* [Dkt. #s 343, 346, 354].

Recently, other defendants have been sentenced to terms similar to the term Mr. Demirtas requests, after entering guilty pleas to providing material support to the Islamic State in Iraq and the Levant ("ISIL"). *See United States v. Muhammad Dakhlalla*, 15-cr-098, Dkt. #80 (N.D. Miss. Aug. 24, 2016) (defendant who attempted to fly to Istanbul to offer services to ISIL sentenced to 96 months)[13]; *United States v. Michael Wolfe*, 14-cr-213, Dkt. #48 (W.D.Tex. June 5, 2015) (defendant who attempted to travel to the Middle East to support ISIL sentenced to 82 months).

Earlier this month, a district court in Minnesota sentenced a number of defendants who either entered guilty pleas or were convicted after trial of providing materials support to ISIL. *See United States v. Hamza Naj Ahmed, Mohamed Abdihamid Farah, Adnan Abdihamid Farah, Abdirahman Yasin Daud, Zacharia Yusuf Abdurahman, Hanad Mustafe Musse, and Guled Ali Omar*, 15-cr-049 (D. Minn). The defendants who went to trial were sentenced to substantial

[13] Dakhlalla's co-defendant was sentenced to 144 months. *See United States v. Jaelyn Delshaun Young*, 15-cr-98-02, Dkt. #71 (N.D. Miss. Aug. 17, 2016).

terms of 30 or 35 years. *See Mohamed Abdihamid Farah*, 15-cr-049-02 (360 months); *Abdirahman Yasin Daud*, 15-cr-049-04 (360 months); *Guled Ali Omar*, 15-cr-049-07 (420 months). However, those who, like Mr. Demirtas, entered into non-cooperation plea agreements to one count of providing material support, were sentenced to terms of 120 months. *Adnan Abdihamid Farah*, 15-cr-049-03 (120 months); *Zacharia Yusuf Abdurahan*, 15-cr-049 -05 (120 months); *Hanad Mustafe Musse*, 15-cr-049-06 (120 months).[14] The circumstances of this case, including Mr. Demirtas's advanced aged, family circumstances, health issues, status as a deportable alien, and conduct after his release in July 2013, demonstrate that a slightly lower sentenced is warranted here, and that imposition of the sentence Mr. Demirtas requests – the equivalent of a 97-month sentence – will not create an unwarranted disparity between his sentence and that imposed in similar cases.

## **Conclusion**

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant. Here, for the foregoing reasons, an additional term of incarceration is not necessary to serve these purposes. Mr. Demirtas has served the equivalent of a 97-month sentence, reflecting the seriousness of the offense. This time, particularly the time served in the D.C. Jail, has been severe punishment and sufficient deterrence, and Mr. Demirtas has demonstrated – after his release from his French sentence – that he will not commit any future crimes, but rather will return to his home in the Netherlands and continue to care for his family.

[14] One defendant entered a guilty plea to material support and financial aid fraud and was sentenced to a total of 180 months. *See Hamza Naj Ahmed*, 15-cr-049-01 (120 months for material support and consecutive 60 months for financial aid fraud).

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
______________________________
MARY MANNING PETRAS

Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500