**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Cr. No. 11-356 (RDM)** |
| **IRFAN DEMIRTAS** | : | |
| **also known as "Nasrullah"** | : | **Sentencing: November 30, 2016** |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

### I. PROCEDURAL BACKGROUND

On December 8, 2011, the government charged the defendant in a sealed Indictment with four terrorism-related offenses. On that same date, a warrant was issued for the defendant's arrest. On January 12, 2015, the defendant was arrested on the Indictment in Germany while transiting through the Düsseldorf Airport. After contesting his extradition, the defendant was extradited from Germany to the United States on July 17, 2015. He was presented to the United States District Court for the District of Columbia for his initial appearance on July 20, 2015. At the initial appearance, and on the government's motion, the Indictment was unsealed.

On April 20, 2016, the government obtained a Superseding Indictment, which charged the defendant with the following offenses: *Count One* – Providing, Attempting and Conspiring to Provide Material Support to Terrorists, in violation of 18 U.S.C. §§ 2339A and 2; *Count Two* – Providing, Attempting and Conspiring to Provide Material Support and Resources to a Designated Foreign Terrorist Organization ("FTO"), to wit, the Islamic Movement of Uzbekistan ("IMU") in

violation of 18 U.S.C. §§ 2339B and 2; *Count Three* – Receiving Military-Type Training from a Foreign Terrorist Organization, to wit, the IMU, in violation of 18 U.S.C. §§ 2339D and 2; and *Count Four* – Discharging, Brandishing, Using, Carrying and Possessing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) & (B) and 2.[1] On September 15, 2016, after unsuccessfully litigating a motion to dismiss on speedy trial grounds, the defendant entered a plea of guilty to Count 2 of the Superseding Indictment (Providing Material Support to the IMU). This offense carries a maximum period of incarceration of 15 years imprisonment.

## II. SENTENCING FACTORS

The Court is required to consider the sentencing factors delineated in 18 U.S.C. § 3553. The factors that are particularly relevant in this case, include: (1) the nature and circumstances of the offense and the history and characteristics of the accused; (2) the sentencing range under the United States Sentencing Guidelines; and (3) the need for the sentence imposed and the kinds of sentences available. 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense/ History and Characteristics of the Defendant

#### 1. Defendant's Criminal Conduct

The defendant, a 57-year-old Turkish-Dutch national, pled guilty to providing material support to the IMU for a period of more than two years. During the charged conduct, the defendant was designated by the IMU leadership as a European-based fundraiser. In this capacity, the defendant raised funds for the IMU and recruited fighters for the IMU. He delivered funds directly to the IMU leadership in Pakistan and facilitated the travel of recruits to IMU training camps in

[1] The violations charged in the Indictment and the Superseding Indictment are identical. The Superseding Indictment contains several non-substantive amendments to the Indictment.

Pakistan, where the recruits received military training on various weapons, including Kalashnikov assault rifles, machine guns and rocket-propelled grenade launchers. The defendant also participated in these IMU military training exercises and created propaganda videos, which he used as fundraising and recruiting tools for IMU's Islamist cause.[2] The IMU, which is further described below, used these funds and fighters to advance its agenda to violently expel the legitimate government of Afghanistan and its allies – to include the armed forces of the United States, – and to establish an Islamic State in the region.

In early 2008, the defendant had been identified by the law enforcement agencies of several European countries as a terrorist fundraiser. At the time, the defendant was living in the Netherlands. In May 2008, the Dutch authorities arrested the defendant at his residence and conducted a lawful search of his residence, resulting in the recovery of physical evidence connecting him to illicit terrorist-related activities. The physical evidence included documents as well as numerous video recordings. The most significant items of documentary evidence that were seized include two letters from the IMU leadership, one of which appointed the defendant as a European-based fundraiser for the IMU, *see* Exhibit 1, and the other which thanked him for providing the IMU with financial support and a communications device. *See* Exhibits 2.[3]

---

[2] The propaganda videos were used by the defendant as proof to donors/potential donors and potential recruits that he was authentic; that is, that he had access to the IMU leadership and that he had successfully delivered recruits and funds to the IMU in support of its cause – the establishment of an Islamic State in Afghanistan and Uzbekistan.

[3] The two IMU letters and their respective translations are attached as Exhibits 1 and 2. They are written to or on behalf of "Nasrullah." The defendant, aware of the inculpatory nature of these documents, has repeatedly attempted to distance himself from that alias, including in an FBI interview of the defendant that was conducted in France in September 2009. The evidence that the defendant is in fact "Nasrullah" is overwhelming. First, the letters were located in the defendant's house where he was present, in his bedroom, and inside a briefcase, which also contained his passport. Second, and most significantly, the defendant and the Emir of the IMU (Tahir Yuldashev) are seen sitting alongside one another in videos that were recovered from the defendant's residence. In these videos, Yuldashev addresses the defendant as "Nasrullah." Third, in one of the videos, Yuldashev personally thanks the defendant, who again is seated alongside him, for providing him with a specific monetary donation. The second letter, which is from Yuldashev, provides thanks to "Nasrullah" for the same specific monetary donation. Fourth, during the September 2009 FBI interview of the defendant, he claimed "Nasrullah" was another person. The defendant, however, was

The videos recordings, which were also found at the defendant's residence, unequivocally link the defendant to the IMU. These videos were created by the defendant during his visits to an IMU training camp in Pakistan. Most of these videos were created in late December 2006- early January 2007. These videos show, among other things, the following:[4]

(1) Leadership Videos - The defendant meeting with Yuldashev, the emir of the IMU. During one such meeting, Yuldashev acknowledges that the defendant has brought recruits to Pakistan to be trained to fight alongside the Taliban. Yuldashev also thanks the defendant (and others) for providing the IMU with financial support, and then explains – in the defendant's presence – the destination of some of the funds that were provided. Yuldashev states that some of the funds are for jihad business and some of funds will be given to its ally, the Taliban. Yuldashev then discusses the IMU's goal to establish an Islamic Caliphate. *See* Exhibits 3 and 3A.

(2) Training Videos – The defendant and several of his recruits appear in training videos at an IMU camp in Pakistan. They are armed with various weapons – including assault rifles, machine guns, and a rocket-propelled grenade launcher. The defendant and the recruits can be seen engaging in military-type training, which includes taking instruction from IMU trainers, firing weapons, and simulating being on patrol. *See* Exhibits 4 and 4A.

(3) Testimonial Videos – The defendant created testimonial videos of his recruits. In the videos, the recruits appear armed and give brief statements about their jihadi mission and

---

unable to provide any identifying information concerning this fictitious Nasrullah despite admittedly having spent a significant time with him. Thus, the only conclusion is that the defendant is Nasrullah.

[4] The videos discussed in this memorandum are available to Court for review. It is the government's intention to play selected portions of some of the video at the sentencing hearing. The selected videos will be provided to the Court and to the defendant in advance of the sentencing hearing. These videos were previously provided to the defendant in discovery.

their present condition. During the testimonials, the recruits often ask the viewer to support their mission, monetarily or otherwise. *See* Exhibits 5 and 5A.

(4) Threat Videos – The defendant and other members of the IMU are seen participating in a threat sequence, in which a series of threats of violence are made against Western nations, including the United States. The video depicts a series of three individuals, all of whom appear with the same backdrop. Each of the individuals is armed and wearing a mask. A second armed man appears in the background throughout these videos. In the first threat, an individual claims that he is from Germany and that he has come to fight alongside the Taliban and the Islamic Emirates of Afghanistan. He threatens Germany and others allied against the Taliban. In the second video, an individual says that "our war is with America." He then goes on to threaten Americans in Afghanistan. In the third video, an individual – who has been identified as the defendant[5] – states that he came here (Pakistan) to wage war against America. He then invites Dutch Muslims to join in his fight. He says that he came from the Netherlands and concludes with a threat against the Netherlands. The defendant displays a Dutch passport, which can be seen resting on a machine gun that he is holding. *See* Exhibit 6.

As noted above, these videos were created by the defendant while visiting IMU facilities in Pakistan during the charged conduct. The location and time of the creation of the videos has been confirmed through various means, including: (1) references to location and time made by the individuals shown in the videos; (2) a reliable cooperating witness ("CW"), who was present

[5] The video recording was found at the defendant's residence among the many other IMU-related videos, which clearly depict the defendant at the IMU camp in Pakistan. Furthermore, a reliable cooperating witness, who was present when this video was created, positively identified the defendant as the third person depicted in the threat sequence. Additionally, the FBI agent who spent several hours interviewing the defendant in September 2009, advised that he immediately recognized the voice of the defendant as the voice of the third person depicted in this video.

during the creation of the videos that were created by the defendant in late December 2006-early January 2007;[6] (3) the defendant's passport, which shows entry and exit stamps from Pakistan, during the relevant time period; and (4) an analysis of the videos by the National Geospatial-Intelligence Agency, which confirmed the location of the IMU camp. Exhibit 7.

**2. The Islamic Movement of Uzbekistan**

The IMU is a militant Islamic group that was formed in the 1990s, with the stated purpose of violently overthrowing the government of Uzbekistan. Since its inception, the IMU has been conducting military operations in Uzbekistan, Afghanistan and Pakistan. In approximately 2000, the IMU allied itself with the Taliban, a radical Sunni Islamist movement that governed Afghanistan from 1996 until late 2001. In 2001, a U.S.-led military coalition removed the Taliban from power in Afghanistan. A lawful government was thereafter elected by the people of Afghanistan. The IMU continues to exist in Afghanistan and Pakistan as an armed insurgency movement against the legitimate government of Afghanistan and its allies, including the armed forces of the United States. The IMU also allied itself with Al Qaeda ("AQ"), and more recently with the Islamic State of Iraq and the Levant ("ISIL"). The IMU consists of hundreds of armed militants committed to establishing an Islamic State through the use of force, including by engaging in terrorist activity/terrorism, such as targeting civilians, to achieve this goal. *See* Exhibit 8 (Excerpts from the U.S. Department of State's Country Report on Terrorism for 2006, 2008 and 2015).

The IMU's ideology was further revealed in three publically available IMU propaganda videos that were acquired during the investigative phase of this case. These videos, which appear to have been professionally made, promote the IMU and espouse its extremist ideology. Two of

[6] The CW advised that many of the propaganda videos that were created in late December 2006 or early January 2007 were filmed in Pakistan in the vicinity of the town of Wana near the Afghanistan border.

the defendant's co-conspirators appear in the videos – Tahir Yuldashev, the co-founder and Emir, appears in all three videos, and one of the defendant's recruits appears in two of the videos alongside Yuldashev. The videos show the following:

a. <u>IMU Video #1 – entitled "IMU"</u>

The video is approximately 30 minutes long. It shows people praying and then men engaged in various military activities including fighting. During one of the military scenes, a speaker ridicules America and "its stooges," and praises attacks on NATO forces. Yuldashev appears in several scenes throughout the video. In one scene, he appears alongside one of the defendant's recruits. Yuldashev and the recruit appear to be armed and looking at a map, as if they are planning a military operation. Yuldashev can also be seen giving speeches to crowds and shooting a weapon. He urges Muslims to join jihad. The video concludes with Muslim leaders urging people to side with the mujahidin and congratulating an attack on the Danish Embassy in Islamabad.

b. <u>IMU Video #2 – entitled "Ramzan"</u>

The second video, which is approximately 51 minutes long, is an interview of Yuldashev. He appears seated at a desk and is interviewed by an unseen person. Throughout the interview, Yuldashev explains the history of the IMU, its allegiance to the Taliban, its leader – Mullah Omar, and its purpose – to enforce Allah's words and to establish an Islamic Caliphate. He states that the Americans are the enemy and that the IMU has and continues to wage jihad against the Americans. He encourages others to carry out suicide and jihad operations on the infidels. The interview is occasionally overlaid with scenes of military-type operations, including a scene depicting Yuldashev and one of the defendant's recruits looking at a map, as if planning a military operation. This map scene appears to be the same scene described in IMU Video #1.

c. IMU Video #3 – entitled "2008-2-27.sehadetvakti.comVideo of Tahir Yuldashev – 1878"

The third video is approximately 48 minutes long. The video consists primarily of military actions interspersed by song and narration and Yuldashev speaking, publically or as part of an interview. Also, Yuldhashev's image is projected during some of the military action scenes, including a scene of an apparent beheading of a Pakistani officer for having stolen from the IHH.[7] The narration and the speeches profess the establishment of an Islamic Caliphate and urge the waging of jihad against infidels.

During the course of this investigation, the FBI identified and interviewed one of the defendant's European-based donors. The donor, who was a co-defendant of the defendant in a French prosecution, admittedly raised approximately €42,000 for the defendant. The donor stated that in an effort to raise money for Yuldashev, the defendant showed him propaganda videos, included the beheading of a Pakistani captain for having allegedly stolen money from Yuldashev that had been donated by the IHH. This account of the beheading is strikingly similar to the beheading in this video, and is a clear indication that the defendant was well aware of the terroristic tactics employed by the IMU. The donor advised that he attempted to distance himself from the defendant after being shown this video.

**3. Defendant's Pre-disposition**

1. Defendant Provided Material Support to Other Terrorist Groups

[7] IHH, which stands for the Foundation for Human Rights and Humanitarian Relief, is a Turkish charitable organization that has been linked to providing support to various terrorist organizations, including Hamas. *See* http://www.jpost.com/International/US-may-list-Turkish-IHH-as-terror-group and http://www.investigativeproject.org/2050/us-investigating-ihh.

In addition to providing material support to the IMU, the defendant has a history of providing material support, in the form of financial support, to other like-minded and often-co-located terrorist organizations, including the Taliban, AQ and rebels in Chechnya. The source of this information includes videotapes that were located during the May 2008 search of the defendant's residence.

a. Material Support – Taliban

The defendant provided material support to the Taliban in the form of financial assistance. As described above, the Taliban is a radical Sunni Islamist movement that governed Afghanistan from 1996 until late 2001. During the Taliban's reign, it enforced a strict interpretation of Sharia or Islamic law. In 2001, a U.S.-led military coalition removed the Taliban from power in Afghanistan. A lawful government was thereafter elected by the people of Afghanistan. The Taliban has continued to exist in Afghanistan and Pakistan as an armed insurgency movement against the legitimate government of Afghanistan and its allies, including the armed forces of the United States. The Taliban has been known to engage in terrorist activity/terrorism, often targeting civilians. Mullah Mohammed Omar founded and led the Taliban until his death in 2013.

The evidence establishing that the defendant provided material support to the Taliban includes, among other things, videos that were located during the search of the defendant's residence in May 2008. The videos show him giving money to the Taliban and or supporting the Taliban for the purpose of establishing an Islamic State.

In one video, the defendant can be seen giving money to a member of the Taliban. The defendant explains that the money is for the families of the martyrs. It is apparent in the video from a reference to a date, that this transaction occurred during the defendant's December 2006-January 2007 trip to Pakistan, during which he facilitated the travel of several recruits to an IMU

camp in Pakistan and provided similar financial assistance to the IMU. In a second video (during the same trip), the defendant can be seen sitting alongside Yuldahsev, the Emir of the IMU. In the video, Yuldashev thanks the defendant and others for providing the IMU with financial assistance. Yuldashev explains that some of the funds are for jihadi business and that $10,000 of the provided funds are for the Taliban. Yuldashev continues to state it is their goal to establish an Islamic State. In a third video, the defendant narrates that he gave the host $20,000 - $10,000 for master Mullah Omar (the leader of the Taliban) and $10,000 for mujahidin master Osama bin Laden (the leader of AQ). In a fourth video, men can be seen in a room distributing money. A flag associated with the Kaplan Movement[8] can be seen in the background. The defendant narrates that the money is being given to the Taliban. The defendant states that his purpose for coming to Afghanistan is on behalf of the Caliphate State. *See* Exhibit 9.

b. Material Support – AQ

As noted above, the defendant provided material support to AQ in the form of financial assistance. AQ, which has been designated by the United States as an FTO since 1999, is a global militant Sunni Islamist organization that was established in 1988-1989. It too is dedicated to the establishment of an Islamic State in the Muslim world. In an effort to reach this goal, AQ has routinely engaged in terrorist activity/terrorism, often targeting civilians and Westerners in terrorist attacks. The Taliban hosted AQ in Afghanistan until 2001, when it was ousted from power by a U.S.-led military coalition. AQ has since allied itself with the Taliban in its armed insurgency movement against the legitimate government of Afghanistan and its allies – including the armed

[8] The Kaplan Movement is an Islamist extremist group which originated in Turkey with the stated goal of overthrowing the government of Turkey and establishing an Islamic State.

forces of the United States. AQ has and continues to commit acts of terrorism throughout the world.

Osama bin Laden is one of the founders of AQ. He led AQ during the time of the charged conspiracy and up until his death in 2011. Also, during the time of the charged conspiracy, AQ leadership operated from and was primarily located in Afghanistan and Pakistan. AQ identifies the Taliban and the IMU as its regional allies. In a video located at the defendant's residence, the defendant narrates, as money is being handed out, that he is giving $10,000 to mujahidin master Osama bid Laden (the head of AQ).[9] This video was co-located at the defendant's residence along with the aforementioned IMU videos. *See* Exhibit 9.

c. Chechen rebels

The defendant's support of violent extremist groups appears to be long-standing. The defendant was depicted in a video – which was recovered by the Dutch authorities during the May 2008 search operation – providing material support to Chechen rebels. The Chechen rebels are from Chechnya (or the Chechen Republic), which is located in the North Caucasus, situated in the southernmost part of Eastern Europe. Chechnya was established in 1991, after the dissolution of the Soviet Union. Since it was established, there has been ongoing and sporadic conflict with Russia. The Islamist Chechen rebels have been engaged in an ongoing insurgency in Chechnya, and have committed multiple terrorist attacks throughout Russia, which have resulted in numerous civilian casualties. See Council on Foreign Relations Report http://www.cfr.org/separatist-terrorism/chechen-terrorism-russia-chechnya-separatist/p9181.

---

[9] This is the same video described above, in which the defendant explained that $10,000 was also for the Taliban. It is noteworthy in this video that the defendant used the term "mujahidin master" in describing the person to whom he had just provided funds, thus suggesting that purpose of the funds was to further the interests of jihadist soldiers, rather than for humanitarian reasons.

The defendant appears in the video with several Islamist Chechen rebels. They discuss the location and date of the video as Baku (Azerbaijan) in 2001. In the video, the defendant claims to be giving money for "Kurbans" (which are animal sacrifices). The defendant and others, however, discuss the true purpose of the money, which is to defeat the Russians in Chechnya and to establish a Caliphate. The defendant discusses giving 115,000 DM (or Deutsche Marks, which in 2001 was valued at approximately $67,000), a satellite phone and military uniforms. The defendant says that this will help give the Russians hell. *See* Exhibit 10. It is worth noting that in the second IMU letter, Yuldshav thanked the defendant for providing the IMU with financial support as well as an international satellite communications device.

**4. Defendant's Conduct While Incarcerated in France**

On May 16, 2008, the defendant was arrested at his residence in Tilburg, Netherlands, pursuant to a European Arrest Warrant, which was issued by France in connection with a French terrorism investigation. On July 19, 2008, the Dutch allowed the transfer of the defendant to France on the condition that the French guaranteed that the defendant would be returned to the Netherlands upon the completion of the French case. The defendant was convicted for terrorism-related offenses, and, on January 8, 2013, he was sentenced to 8 years in prison. The defendant was returned to the Netherlands on July 17, 2013, where he was to complete his sentence. The Dutch, however, immediately released the defendant and imposed a time-served sentence. The defendant remained in French custody from July 28, 2008, through July 17, 2013.

The defendant's conduct while incarcerated in France further exemplifies the danger that he poses to Western society, including the United States. Rather than showing remorse or repentance for his criminal conduct, the defendant exhibited defiance and engaged in multiple incidents of misconduct. The French authorities reported that the defendant regularly attempted

to indoctrinate the prison population to convert to a radical form of Islam and to cause disorderly conduct in the name of this cause. He was also observed providing instructions on fighting techniques to his fellow inmates. The French authorities viewed him as a significant security threat – even while incarcerated. As a result, he was transferred among various French jails.

**B. Sentencing Guidelines**

**1. Guidelines – Plea Agreement**

Pursuant to the Plea Agreement (Docket # 89, p.4-5), the parties agreed that the following Guideline calculation is applicable in this case for Count Two:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2M5.3(a) | 26 |
| Terrorism Enhancement (U.S.S.G. § 3A1.4) | +12 |
| Sub-Total: | 38 |
| Acceptance of Responsibility | -3 |
| Total | 35 |

Based upon the terrorism enhancement provided for in U.S.S.G. § 3A1.4, the defendant has a Criminal History Category VI. Additionally, based upon the agreed upon total offense level (of 35) and the estimated Criminal History (VI), the defendant's Sentencing Guideline range is 292 months to 365 months. Since the statutory maximum sentence for Count Two is 15 years, the Estimated Applicable Guideline range is 15 years.

2. **Enhancement Appropriate**

While any further guideline enhancement will not affect the overall guideline range for the defendant, an enhancement for the specific offense characteristic provided for in U.S.S.G. 2M5.3(b)(1)(e) is appropriate. Section 2M5.3(b)(1)(e) provides for a two-point enhancement to the base offense level where the funds or other material support or resources has been provided

with the intent, knowledge, or reasons to believe they are being used to commit or assist in the commission of a violent act.

The evidence supporting this enhancement is overwhelming. First, the plea and the facts in support of the plea support the enhancement. On September 15, 2016, the defendant entered a guilty plea to providing material support or resources to an FTO, in violation of 18 U.S.C. § 2339B. Specifically, the defendant acknowledged providing funds directly to Yuldashev, knowing that these funds would be used in support of the IMU. The defendant acknowledged that at the time he provided the funds, he knew that the IMU engaged in terrorist activity. He also admitted being present when Yuldashev made threats to Americans.

Other evidence – described in more detail throughout this memorandum – demonstrates that the defendant knew the funds would be used to commit or assist in the commission of violent acts. Yuldashev stated in the defendant's presence that it was the goal of the IMU to establish an Islamic Caliphate in the region through armed conflict with America and its allies. Yuldashev also stated in the defendant's presence that the IMU was allied with the Taliban in this armed conflict. Additionally, the defendant facilitated the travel of at least five Turkish recruits to an IMU training camp in Pakistan. The defendant video-taped these individuals receiving military-type training from a member of the IMU at the IMU camp. This training included target practice with assault rifles and machine guns. As seen in these videos, the defendant too participated in these training exercises, receiving training on an assault rifle, a machine gun and a rocket propelled grenade launcher. It was during these exercises that the defendant and the other IMU members laughed about targeting the then-President of the United States. Additionally, the defendant possessed and participated in the above-described threat sequence, which was created during the defendant's visit to an IMU camp in Pakistan. The defendant and the other IMU members appear in the video

armed while making threats against Western nations, including the United States. One of the most telling indications of the defendant's intent is a statement made by the defendant during this sequence. The defendant states that he came here (meaning Pakistan) to wage war with America. The only logical conclusion is not just that he knew or had reason to believe that the funds would be used to commit or assist in the commission of a violent act (which is all that is required for the enhancement), but that he intended that result.

The defendant clearly had knowledge and reasons to believe that the support he was providing would be used to commit or assist in the commission of a violent act. Thus, the defendant's actual offense level should be amended to 37, which along with his estimated Criminal History (VI), gives the defendant a Sentencing Guideline range of 360 months to life. Again, since the statutory maximum sentence for Count Two is 15 years, the Estimated Applicable Guideline range remains 15 years.

### 3. The Defendant Is Not Entitled to Credit for Time He Served in the French Case, nor Should He Receive any such Consideration

The defendant was arrested on May 16, 2008, in the Netherlands in connection with a French criminal investigation. He was transferred to France for criminal prosecution. He remained in French custody from July 19, 2008, through July 17, 2013. Despite being convicted in France for conduct similar to the conduct for which he was charged in this case, he is not entitled to credit for time he served in connection with the French case, nor is any consideration for such time appropriate in this case.

#### a. A Prisoner is Not Entitled to Credit Against a Federal Sentence for Time Already Credited Against Another Sentence.

The relevant statute, 18 U.S.C. § 3585(b), provides that:

> "A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> (1) as a result of the offense for which the sentence was imposed; or
>
> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>
> *that has not been credited against another sentence."*

18 U.S.C. § 3585(b) (emphasis added). In plain language, §3585(b) expresses that, in order to receive credit towards a federal sentence for time spent in detention, whether it be time spent in federal, state, or foreign custody, a defendant must satisfy the requirements of either §3585(b)(1) or (b)(2), *and* he must not have already received credit towards some other sentence for the time he was held in custody. *United States v. Merritt*, 782 F. Supp. 12 (D. Mass. 1992); 18 U.S.C. § 3585(b).

The Supreme Court has explained that when Congress enacted this statute, it "made clear that a defendant could not receive a double credit for his detention time." *United States v. Wilson*, 503 U.S. 329, 337 (1992). In addition, the Bureau of Prisons ("BOP") Program Statement No. 5880.28 states that "credit will not be given for any portion of time spent serving another sentence regardless of whether the sentence is federal, state, or foreign." PS 5880.28, at 1–16, 1–17, 1–21. Though "BOP's internal agency guideline[ ] is akin to an interpretive rule that does not require notice and comment, [it] is still entitled to some deference." *Reno v. Koray*, 515 U.S. 50, 61 (1995) (citation and quotation marks omitted).

Lower courts, applying the interpretations of the Supreme Court and BOP guidelines, have consistently held that time spent in detention fulfilling a sentence received in a different jurisdiction cannot be credited again toward fulfilling a new sentence. *See, e.g., United States v.*

*Efrosman*, 62 Fed. Appx. 24 (2d Cir. 2003) (holding that the defendant was not entitled to credit against his federal sentence for time spent incarcerated in a French prison because the totality of the defendant's 15-month incarceration in France was credited against the totality of the 15-month French sentence imposed, and Section 3585(b) precludes him from also receiving 15-months confinement credit against his federal sentence in the United States); *Dominguez v. Williamson*, 251 F.3d 156 (5th Cir. 2001) (holding that petitioner could not receive credit against a federal sentence for the time he spent serving two concurrent state sentences because that time was already credited towards his two concurrent state sentences; such "double credits" are not allowed); *Easley v. Stepp*, 5 Fed. Appx. 541 (7th Cir. 2001) (finding that the petitioner could not receive credit against his federal sentence for time spent serving his state sentence since that time counted as credit towards his state sentence); *Scruggs v. Adkinson*, 423 Fed. Appx. 858 (11th Cir. 2011) ("[C]redit will not be given for any portion of time spent serving another sentence regardless of whether the sentence is federal, state, or foreign") (citing BOP Program Statement No. 5880. 28); *United States v. Blue*, 874 F. Supp. 409, 413 (D.D.C. 1995) (finding that the defendant was not entitled to credit for time served as of the date of her arrest for the federal charge of forgery, because at that time she was, in fact, in custody as a result of her D.C. parole violation); *Robinson v. Drew*, No. 9:03-CV-1139, 2006 WL 1064180, at *2 (N.D.N.Y. April 20, 2006) (holding that Robinson could not be given credit for time previously served in state prison, though it was for similar conduct, because that time served was credited toward his state sentence).

Furthermore, even if the court were to assume, arguendo, that § 3585(b) is "silent or ambiguous" as to whether a foreign sentence qualifies as "another sentence," the BOP's construction of the statute is reasonable and is therefore entitled to deference. *See Dawson v. Scott*, 50 F.3d at 884, at 886–87 (11th Cir. 1995); *Scruggs,* 423 Fed. Appx. at 861.

Alternatively, courts will give credit towards a federal sentence for time spent in detention when the person meets the requirements of either §3585(b)(1) or (b)(2), *and* that time has not been credited against any other sentence. For example, in *United States v. Benefield*, the defendant requested a credit against a federal sentence for the time spent in state custody prior to the commencement of his related federal sentences. *United States v. Benefield*, 942 F.2d 60, 67 (1st Cir. 1991). The court granted credit for the time the defendant spent detained *prior* to the sentence, since that time had not been credited against his state sentence. Importantly, though, the court did not hold that time actually served for the state sentence could be credited towards the federal sentence. *Id; see also Hughes v. Slade*, 347 F. Supp. 2d 821 (C.D. Cal. 2004) (finding that the petitioner was entitled to credit against his federal sentence for time he spent detained in Mexico, even though the charges were different, since he met the requirements of § 3585(b)(2) *and* he had not received credit towards any sentence for the time he was detained in Mexico; the petitioner was detained in Mexico for over three years but, during an appeals process, while out on bond, he returned to the United States before his Mexican sentence began and therefore when he was sentenced in the United States, he had not yet received credit towards any sentence for his time detained in Mexico).

In this case, the defendant was convicted of terrorism-related offense in a French court and sentenced to 8-years imprisonment. As described above, he was held in French custody for approximately five years. Because the five years of time served in connection with the French case has been previously credited towards the fulfillment of his French sentence, neither statute,

BOP guidelines, nor common law, entitle him to now receive "double credit" against his federal sentence. *Wilson*, 503 U.S. at 337.[10]

b. <u>The Defendant Should Receive No Consideration for the Time Spent in French Custody</u>

The defendant should not receive any consideration in this case for time he served in connection with the French case. First, the government, in extending an offer to one count of the Superseding Indictment, has already given the defendant due consideration for any time he served in connection with the French case. Second, the sentencing guidelines for the offense to which the defendant entered a guilty plea call for a sentence that is well above the statutory maximum. As explained above, but for the statutory maximum of 15 years, the appropriate guideline range for the defendant's conduct would be 360 months to life. The defendant himself agreed as part of the plea that, but for the statutory maximum, the appropriate guideline range for his conduct was 292 to 365 months – essentially twice the statutory maximum. (See Docket #89 p.4-5).

Additionally, two equally important factors – which weigh heavily against the defendant receiving any consideration for time he served in connection with the French case – are his long standing commitment to supporting terrorist groups and his conduct while in custody on the French case. As noted above, he has provided support to terrorist organizations since at least 2001, including the Chechen rebels, the Taliban, AQ and the IMU. He persisted with this same mindset even after his arrest and incarceration in the French case. Rather than showing remorse or repentance while incarcerated on the French case, the defendant was divisive and defiant. He radicalized the prison population and was viewed as a security concern by the French prison authorities. As a result, he had to be moved among various French prisons. He should not be

---

[10] As noted in the record, once the defendant was returned to the Netherlands in July 2013, he was released and then resentenced in October 2013. The Dutch imposed a sentenced of time-served. Thus, the defendant also received a credit for this time in the Dutch re-sentencing proceeding.

rewarded for such conduct, and should therefore receive no consideration for time spent incarcerated in the French case.

**C. Need for Sentence/ Kind of Sentences Available**

It is necessary to impose a sentence that will punish the defendant for his criminal conduct as well as deter him and others from engaging in such conduct. The defendant was the authorized European-based fundraiser for the IMU, an FTO dedicated to committing acts of terrorism, which included targeting Americans. The defendant also facilitated the travel of recruits to IMU training camps in Pakistan. Fundraisers and recruiters, like the defendant, are the life-line of terrorist organizations. The defendant, who has dual Turkish-Dutch citizenship, used his access to the West to support an organization destructive to the West. As punishment for this conduct, he should receive the maximum punishment permissible under the Plea Agreement. Such a sentence will also serve to deter the defendant from future similar conduct. Physically, he will be contained so he cannot travel throughout Europe and Asia, where he was able to raise money and recruit fighters for the IMU (and other terrorist organizations). Additionally, a significant sentence will serve as a deterrent to others inclined to engage in such activity.

**D. Conclusion and Recommendation**

The defendant entered a plea to Count Two of the Superseding Indictment, which charged Providing Material Support and Resources to a DTO, in violation of 18 U.S.C. §2339B. Based on, among other things, the sentencing guidelines (which call for a 15-year sentence), the defendant's significant role in the IMU (as a recruiter and as the designated European-based fundraiser), his long history supporting terrorist organizations (including AQ, the Taliban and Chechen rebels), his lack of remorse (as evidenced in his attempt to minimize his conduct during his FBI interview in September 2009, his conduct while in French custody, as well as his efforts

to contest his extradition from Germany), and his continued efforts to further his radical agenda (as evidenced by his conduct while in French custody), the government recommends a sentence of 15 years. The defendant is entitled to a credit from the date he was arrested in Germany on our provisional arrest warrant in this case, January 12, 2015. He is not entitled to any credit or consideration for any time he served in connection with the French case.

WHEREFORE, the government respectfully submits this memorandum in aid of sentencing.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar Number 415 793

By:_____/s/_____________________
MICHAEL C. DILORENZO
(MD Bar #: 931214 0189)
ARI REDBORD
(DC BAR #: 476 998)
Assistant United States Attorneys
BRIAN MORGAN
Trial Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
Michael.Dilorenzo@usdoj.gov
Ari.Redbord@usdoj.gov
Brian.Morgan@usdoj.gov

Certificate of Service

I certify that a copy of the foregoing motion and proposed order have been sent to Counsel for the Defendant, Mary Petras, Esquire, by ECF, this 23rd day of November, 2016.

________/s/____________________
Michael C. DiLorenzo
Assistant United States Attorney